IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

VARUN SHAH,                          §
                                     §
                    Plaintiff,       §
                                     §   Civil Action No. 3:13-CV-4834-D
VS.                                  §
                                     §
UNIVERSITY OF TEXAS                  §
SOUTHWESTERN MEDICAL                 §
SCHOOL, et al.,                      §
                                     §
                    Defendants.      §

MEMORANDUM OPINION
AND ORDER

Plaintiff Varun Shah ("Shah"), who was dismissed from medical school, sues defendant University of Texas Southwestern Medical Center ("UT Southwestern"), three UT Southwestern faculty members, and the UT Southwestern Senior Associate Dean, alleging claims under 42 U.S.C. § 1983; the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794; Title III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq*.; and under Texas law for breach of contract and intentional infliction of emotional distress ("IIED").  Defendants move to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) and under Tex. Civ. Prac. & Rem. Code Ann. § 101.106 (West 2011).  For the reasons that follow, the court grants defendants' motions and grants Shah leave to replead.

I

Shah was enrolled as a medical student at UT Southwestern until he was dismissed.[1]
He successfully completed the first two years of his education and finished several third-year
rotations, including his first internal medicine rotation.  In February 2013 Shah began his
second internal medicine rotation.  Defendant Belinda Vicioso, M.D. ("Dr. Vicioso"), a UT
Southwestern professor, was in charge of the first part of this rotation, which lasted until
March 8, 2013.   Although Shah received many positive reviews and feedback from
physicians during this part of the rotation, Dr. Vicioso gave Shah the lowest grades possible
for his history and physical examination skills and the second lowest grade possible for his
professionalism/interpersonal skills.  She stated: "communication and misses innuendos or
subtle actions," and that Shah was "resistant or defensive in accepting criticism. . . .  Not
always comfortable interacting with others." Compl. ¶ 23.  Shah alleges that these comments
were not based on his performance in the rotation but instead on personal animus that Dr.
Vicioso harbored toward him due to his disability—Attention Deficit Hyperactivity Disorder
("ADHD")—and his ethnicity.

The next part of Shah's internal medicine rotation was under defendant Tara Duval,

---

[1]In deciding defendants' Rule 12(b)(6) motion, the court construes Shah's complaint
in the light most favorable to him, accepts as true all well-pleaded factual allegations, and
draws all reasonable inferences in his favor.  *See, e.g., Lovick v. Ritemoney Ltd.*, 378 F.3d
433, 437 (5th Cir. 2004).  "The court's review [of a Rule 12(b)(6) motion] is limited to the
complaint, any documents attached to the complaint, and any documents attached to the
motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star
Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citation
omitted).

M.D. ("Dr. Duval"), a UT Southwestern assistant professor.  Dr. Duval also gave Shah a failing grade, allegedly for "professionalism issues." *Id.* ¶ 24.  Shah asserts that the failing grade was predetermined and without regard for his performance in the rotation, and was based purely on the fact that Dr. Vicioso had given Shah a low grade.

After Drs. Vicioso and Duval submitted their assessments, defendant Amit Shah, M.D. ("Dr. Shah"), a UT Southwestern assistant professor, wrote a letter to the Student Promotions Committee ("SPC") in support of the assessments of Drs. Vicioso and Duval. Dr. Shah recommended that Shah be removed from medical school.  Shah alleges that Dr. Shah's statements were not based on any facts but were made to appease his departmental superior, Dr. Vicioso, and to conceal the fact that his departmental junior, Dr. Duval, had submitted an arbitrary and capricious report to the SPC regarding Shah.

As a result of the comments from Drs. Vicioso, Duval, and Shah regarding their concerns about Shah's "professionalism," he was called before the SPC.  Under school policy, after a student has three admonishments for lack of professionalism, the SPC meets to discuss these concerns.  Although Shah was not permitted to attend the SPC meeting, on the advice of Angela Mihalic, M.D. ("Dr. Mihalic"), Associate Dean for Student Affairs, he drafted a letter to the SPC accepting the charges, taking responsibility for his conduct, and suggesting a plan to improve.  Shortly after the SPC meeting, Shah was informed that he was being dismissed from UT Southwestern based on lack of professionalism.

Shah appealed the SPC decision.  He noted that he suffered from ADHD, that his ability to organize and stay on task was affected both by his ADHD and his medication, and

that he would undergo specific counseling for his ADHD to deal with these issues and other problems related to ADHD.  Shah's appeal was denied, allegedly without regard for his ADHD.  Shah filed a final appeal, but defendant Charles Ginsburg, M.D. ("Dr. Ginsburg"), the UT Southwestern Senior Associate Dean, and others denied the appeal without explanation, and despite the fact that Shah's "alleged 'professionalism' violations were a direct result of his disability."  *Id.* ¶ 33.

Shah then filed this lawsuit against UT Southwestern, Dr. Vicioso, in her individual capacity, Dr. Duval, in her individual capacity, Dr. Ginsburg, in his individual capacity, and Dr. Shah, in his individual capacity.[2]  Shah alleges claims under 42 U.S.C. § 1983 against all defendants, alleging violations of his rights to procedural due process, substantive due process, and equal protection, and against all defendants for IIED, under Texas law; and he alleges claims against UT Southwestern alone for violations of § 504 of the Rehabilitation Act and Title III of the ADA, and for breach of contract, under Texas law.  In three motions, defendants move to dismiss under Rule 12(b)(1), Rule 12(b)(6) , and Tex. Civ. Prac. & Rem. Code Ann. § 101.106.[3]  Shah opposes the motions.

---

[2]He also names as defendants Does I through X, who allegedly are unknown to him but "are responsible in some manner for the events and happenings referred to in [the complaint] and proximately caused damages to [Shah]."  Compl. ¶ 8.

[3]The motions have been filed by Dr. Shah, Drs. Vicioso and Duval, and Dr. Ginsburg and UT Southwestern.

- 4 -

II

"Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citations omitted).

Under Rule 12(b)(6), the court evaluates the pleadings by "accept[ing] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). To survive defendants' motion, the complaint must allege enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level [.]"). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the

pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678 (citation omitted).

### III

The court begins with UT Southwestern's Rule 12(b)(1) motion to dismiss Shah's § 1983, ADA, breach of contract, and IIED claims based on Eleventh Amendment immunity.[4]

### A

UT Southwestern contends that the Eleventh Amendment bars Shah's § 1983, ADA, breach of contract, and IIED claims because UT Southwestern qualifies for such immunity[5]

_____

[4]When Eleventh Amendment immunity applies, it deprives the court of subject matter jurisdiction. *See, e.g., Ross v. Tex. Educ. Agency,* 409 Fed. Appx. 765, 768 (5th Cir. 2011) (per curiam) ("We review Eleventh Amendment sovereign immunity determinations, as we do other questions of subject matter jurisdiction, as a question of law *de novo*."). A Rule 12(b)(1) motion challenging the court's subject matter jurisdiction can mount either a facial or factual challenge. *See, e.g., Hunter v. Branch Banking & Trust Co.*, 2013 WL 607151, at *2 (N.D. Tex. Feb. 19, 2013) (Fitzwater, C.J.) (citing *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. May 1981)). When a party makes a Rule 12(b)(1) motion without including evidence, the challenge to subject matter jurisdiction is facial. *Id.* The court assesses a facial challenge as it does a Rule 12(b)(6) motion in that it "looks only at the sufficiency of the allegations in the pleading and assumes them to be true. If the allegations are sufficient to allege jurisdiction, the court must deny the motion." *Id.* (citation omitted) (citing *Paterson*, 644 F.2d at 523).

[5]The Fifth Circuit and judges of this court have held that UT Southwestern is an arm or instrumentality of the State of Texas. *See, e.g., Elhaj-Chehade v. Office of Chief Admin. Hr'g Officer*, 235 F.3d 1339, 2000 WL 1672679, at *1 (5th Cir. Oct. 16, 2000) (per curiam) (unpublished table decision) ("[UT Southwestern] is an arm of the State."); *Estate of Hernandez v. United States*, 2013 WL 3579487, at *1 (N.D. Tex. July 15, 2013) (Lynn, J.) (reasoning that UT Southwestern is entitled to Eleventh Amendment immunity, and citing

- 6 -

and Eleventh Amendment immunity has not been waived or abrogated.  Shah does not

challenge UT Southwestern's contentions that it is an arm or instrumentality of the State of

Texas[6] and there has been no waiver or abrogation of its immunity from his § 1983, ADA

Title III,[7] breach of contract, or IIED claim.  Instead, Shah contends that, because he has

asserted claims for injunctive and declaratory relief and has named state officials as

defendants, UT Southwestern is not entitled to Eleventh Amendment immunity under *Ex

parte Young*, 209 U.S. 123 (1908).

## B

The Eleventh Amendment provides that "[t]he Judicial power of the United States

shall not be construed to extend to any suit in law or equity, commenced or prosecuted

against one of the United States by Citizens of another State, or by Citizens or Subjects of

any Foreign State."[8]  The Eleventh Amendment bars private suits in federal court against

---

cases in support); *Turner v. Univ. of Tex. Sw. Med. Ctr. at Dall.*, 2007 WL 959032, at *2 (N.D. Tex. Mar. 30, 2007) (Lindsay, J.) (concluding that Texas law "strongly indicate[s] that [UT Southwestern] is an arm or instrumentality of the State of Texas for Eleventh Amendment purposes").

[6]Shah alleges in his complaint that UT Southwestern "is a subdivision of the State of Texas."  Compl. ¶ 2.

[7]Shah contends in his response that he erroneously pleaded his ADA claim as a violation of Title III, and he seeks leave to amend his complaint to plead a claim under Title II.  Shah does not assert that UT Southwestern's Eleventh Amendment immunity was abrogated under Title III of the ADA.  To the extent that Shah argues that Eleventh Amendment immunity does not apply to a Title II claim, the court need not address this argument because Shah does not plead a Title II-based ADA claim in his complaint.

[8]"Although courts and litigants often use 'Eleventh Amendment immunity' as a 'convenient shorthand,' the phrase is 'something of a misnomer, for the sovereign immunity

states, including state agencies, unless the state has waived, or Congress has abrogated, the

state's sovereign immunity.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89,

98-100 (1984); *Aguilar v. Tex. Dep't of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir.

1998).  The reference to actions "against one of the United States" has been interpreted to

"encompass[] not only actions in which a State is actually named as the defendant, but also

certain actions against state agents and state instrumentalities."  *Sw. Bell Tel. Co. v. City of

El Paso*, 243 F.3d 936, 937 (5th Cir. 2001) (quoting *Regents of the Univ. of Cal. v. Doe*, 519

U.S. 425, 429 (1997)).

Shah's reliance on *Ex parte Young* to overcome UT Southwestern's Eleventh

Amendment immunity is misplaced.  "The [*Ex parte*] *Young* exception 'has no application

in suits against the States and *their agencies*, which are barred regardless of the relief

sought.'"  *Moore v. La. Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 963 (5th Cir.

2014) (quoting *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146

(1993)).

Nor can Shah rely on the fact that he is suing the individual defendants as well.  "To

meet the *Ex Parte Young* exception, a plaintiff's suit alleging a violation of federal law must

be brought against individual persons in their *official* capacities as agents of the state[.]"

*Aguilar*, 160 F.3d at 1054 (emphasis added) (citing *Saltz v. Tenn. Dep't of Emp't Sec.*, 976

---

of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment.'"
*Stiff v. Stinson*, 2013 WL 3242468, at *3 n.3 (N.D. Tex. May 28, 2013) (Ramirez, J.)
(quoting *N. Ins. Co. of N.Y. v. Chatham Cnty., Ga.*, 547 U.S. 189, 193 (2006)), *rec. adopted*,
2013 WL 3242468 (N.D. Tex. June 27, 2013) (Fitzwater, C.J.).

F.2d 966, 968 (5th Cir. 1992)).  Shah is suing the individual defendants in their *individual*, not their *official*, capacities.[9]

Accordingly, because Shah's § 1983, ADA Title III, breach of contract, and IIED claims against UT Southwestern are barred by Eleventh Amendment immunity, the court dismisses these claims against UT Southwestern under Rule 12(b)(1) for lack of subject matter jurisdiction.

IV

The court next considers whether the individual defendants—Drs. Vicioso, Duval, Ginsburg, and Shah—are entitled to qualified immunity from Shah's § 1983 claims.

The doctrine of qualified immunity protects government officials from suit and liability for civil damages under § 1983 insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *E.g., Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Once qualified immunity is asserted, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense.  *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam).  "The Supreme Court has characterized the doctrine as protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  *Cozzo v. Tangipahoa Parish Council-President Gov't*, 279 F.3d 273, 284 (5th Cir. 2002) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

---

[9]*See* Compl. ¶¶ 3-6 (identifying each individual defendant and alleging that each such defendant "is sued individually").

"To decide whether defendants are entitled to qualified immunity, the court must first answer the threshold question whether, taken in the light most favorable to plaintiff[] as the part[y] asserting the injuries, the facts [he has] alleged show that defendants' conduct violated a constitutional right." *Ellis v. Crawford*, 2005 WL 525406, at *3 (N.D. Tex. Mar. 3, 2005) (Fitzwater, J.) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  This must be the initial inquiry.")).[10]  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201. "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id*.  "Even if the government official's conduct violates a clearly established right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable." *Wallace v. Cnty. of Comal*, 400 F.3d 284, 289 (5th Cir. 2005).  "The objective reasonableness of allegedly illegal conduct is assessed in light of the legal rules clearly established at the time it was taken." *Salas v. Carpenter*, 980 F.2d 299, 310 (5th Cir. 1992) (citing *Anderson v. Creighton*,

---

[10]*Saucier*'s two-step procedure for determining qualified immunity is no longer mandatory. *See Pearson*, 555 U.S. at 232, 236.  Courts are free to consider *Saucier*'s second prong without first deciding whether the facts show a constitutional violation. *Id*. at 236. The "decision does not prevent the lower courts from following the *Saucier* procedure; it simply recognizes that those courts should have the discretion to decide whether that procedure is worthwhile in particular cases." *Id.* at 242.

483 U.S. 635, 639 (1987)).  "'The defendant's acts are held to be objectively reasonable unless *all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the' plaintiff's asserted constitutional or federal statutory right."  *Cozzo*, 279 F.3d at 284 (quoting *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001)).

V

The court considers first whether the individual defendants are entitled to qualified immunity with respect to Shah's § 1983 claim alleging a denial of procedural due process.

A

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). In *Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78 (1978), the Supreme Court of the United States assumed, without deciding, that students have some protected interest in public higher education.  *Id.* at 84-86 (assuming that medical student had been deprived of liberty or property interest when she was dismissed from medical school, and considering merits of procedural due process claim).  The Fifth Circuit has made the same assumption in cases decided after *Horowitz.  See Shaboon v. Duncan*, 252 F.3d 722, 730 (5th Cir. 2001) (assuming, without deciding, that medical resident had protected due process interest in his position); *Davis v. Mann*, 882 F.2d 967, 973 (5th Cir. 1989) (quoting *Horowitz*, "'assuming the existence of a liberty or property interest,'" and holding that dental resident

received adequate process under Fourteenth Amendment).

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). But due process, "unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances"; instead, it is "flexible and calls for such procedural protections as the particular situation demands." *Id.* (citations and internal quotation marks omitted). In a public university setting, the level of procedural protection that students are due varies according to whether they were dismissed for *disciplinary* or *academic* reasons.[11] *See Horowitz*, 435 U.S. at 86. When a student is dismissed for *disciplinary* reasons, the Fourteenth Amendment requires that "the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss v. Lopez*, 419 U.S. 565, 581 (1975). But *academic* dismissals "call[] for far less stringent procedural requirements," *Horowitz*, 435 U.S. at 86, although it is still required that the student "be given some meaningful notice and an opportunity to respond." *Davis*, 882 F.2d at 975 (citing *Mathews*,

---

[11]"A student is dismissed for *disciplinary* reasons when he violates a valid rule of conduct." *Aragona v. Berry*, 2012 WL 467069, at *5 (N.D. Tex. Feb. 14, 2012) (Fish, J.) (*Horowitz*, 435 U.S. at 87; *Shaboon*, 252 F.3d at 730). By contrast, in *Horowitz* the student was deemed to have been dismissed for *academic* reasons because the dismissal "rested on the academic judgment of school officials that [the student] did not have the necessary clinical ability to perform adequately as a [medical doctor] and was making insufficient progress toward that goal." *Horowitz*, 435 U.S. at 89-90.

424 U.S. at 333); *see also Horowitz*, 435 U.S. at 85 (holding that student received all the due

process that the Fourteenth Amendment required where "[t]he school fully informed [her]

of the faculty's dissatisfaction with her clinical progress and the danger that this posed to

timely graduation and continued enrollment.").  The Due Process Clause does not require that

students dismissed for failure of academic performance be given a hearing.  *See Horowitz*,

435 U.S. at 90 ("[W]e decline to ignore the historic judgment of educators and thereby

formalize the academic dismissal process by requiring a hearing."); *Davis*, 882 F.2d at 975

(holding that where student was dismissed for failure of academic performance, he "was not

entitled to any hearing—much less the full-blown posttermination hearing he received.").

Nor does due process require that a student dismissed based on poor academic performance

be afforded a right of appeal.  *See, e.g., Yoder v. Univ. of Louisville*, 526 Fed. Appx. 537, 551

(6th Cir. 2013) (unpublished table decision) (holding that "post-dismissal appeal hearing was

not constitutionally required" where nursing student was dismissed for academic reasons).

B

In an apparent reference to UT Southwestern alone,[12] Shah alleges that "Defendant"

---

[12]In the first sentence of ¶ 42 of his complaint, Shah alleges:

> Defendant failed to comply with its own policies and due
> process protections set forth in its University's Student
> Disciplinary Policy and the University Statutes by failing to
> allow Plaintiff any type of hearing or opportunity to address the
> false allegations made against him prior to his dismissal, by
> failing to allow him to confront the witnesses against him.

Compl. ¶ 42.  This allegation appears to relate only to UT Southwestern.  The second

violated his procedural due process rights by failing to allow him any type of hearing or opportunity to address the false allegations made against him prior to his dismissal, and by failing to allow him to confront the witnesses against him, in violation of the policies and due process protections set out in the university's student disciplinary policy and the university statutes.  Shah also alleges that all defendants denied him an opportunity to directly confront Drs. Vicioso, Shah, Duval, and Mihalic and offer counter arguments to the SPC.  Referring again to a single unnamed defendant, Shah avers that he was not provided written notice that adequately explained the reasons for his dismissal, but was only informed that the committee had reviewed the forms submitted against him and had recommended dismissal on the grounds of professionalism; that he was denied an adequate opportunity to appeal the determination; and that he was not provided Dr. Shah's letter, which denied him the opportunity to address the false allegations against him.  Without tying the allegation to a particular defendant, Shah alleges that he was denied the right to have counsel or any advocate at the SPC hearing.   Shah also avers that Drs. Shah and Mihalic filed professionalism forms without allowing Shah to explain his side of the story; that Shah was not aware that Dr. Mihalic had filed a form until two months after the fact; that the SPC that recommended Shah's dismissal was biased toward him because the head of the SPC was someone who had already provided negative reviews regarding Shah's professionalism

---

sentence of ¶ 42 refers more generally to "Defendants," asserting that "Defendants denied [Shah] an opportunity to directly confront Drs. Vicioso, Shah, Duval and Mihalic and offer counter arguments to the SPC."  *Id.*

during a surgery rotation; and that Shah provided UT Southwestern with sufficient information that he suffered from ADHD, but it ignored his disability and failed to consider the fact that his alleged "professionalism" violations were a direct result of his disability.

C

The individual defendants contend they are entitled to qualified immunity from Shah's § 1983 procedural due process claim because his complaint does not adequately specify which deficiencies in the SPC and appeal processes are allegedly attributable to a particular individual defendant. They also posit that the complaint clearly establishes that, at every step of the review and dismissal process, Shah was afforded more process than he was due. And they maintain that Shah was notified of his inadequate performance through the evaluations of Drs. Vicioso and Duval; he was informed by UT Southwestern's professionalism policy that repeated professionalism deficiencies could result in dismissal; he was given the opportunity to, and did, provide the SPC a written response and explanation for his deficiencies; and he was given the opportunity to appeal his dismissal. The individual defendants therefore posit that, because Shah was given more process than was due, he was not deprived of due process as a result of their conduct, and are entitled to a dismissal of his § 1983 procedural due process claim based on qualified immunity.

Shah responds that a student has both protected liberty and property interests in his public education; that, to satisfy procedural due process, before a student is terminated or suspended for deficiencies in meeting minimum academic performance standards, school authorities must advise the student of his failure or impending failure to meet these standards;

- 15 -

and that UT Southwestern did not afford him the required due process before giving him a failing rotation grade and dismissing him from the program.  Shah maintains that he was not given any negative feedback by Drs. Vicioso, Duval, and Shah, the only instructors who issued him failing grades; Dr. Shah submitted a letter to the SPC, but did not attempt to speak with Shah beforehand, did not attempt to obtain Shah's side of the story, and did not allow Shah to see any evidence or discuss the alleged professionalism violations with any of the witnesses to these alleged violations, and, in so doing, denied Shah the opportunity to object to or respond to Dr. Shah's allegations before his report was submitted to the SPC; he was not notified of the full agenda and purpose of the SPC meeting, not notified of his rights in this process, not permitted to attend the SPC meeting, and not permitted to have anyone advocate on his behalf before the SPC; and, although Dr. Ginsburg was made aware of these violations in Shah's appeal and had an opportunity to correct the violations of Shah's due process rights on appeal, he chose to ignore them and denied Shah's appeal without any basis, let alone a rational basis.

D

The threshold question that the court must decide is whether, taken in the light most favorable to Shah, the facts alleged in his complaint show that the conduct of the particular individual defendant in question violated a constitutional right.  If the allegations of the complaint were established, but no constitutional right would have been violated, the individual defendant in question is entitled to qualified immunity, without the necessity that the court reach the other aspects of the qualified immunity inquiry.

- 16 -

The court will set to one side the question whether Shah has adequately pleaded that a particular individual defendant was personally involved in the specific conduct that allegedly deprived him of his right to due process, or there was a causal connection between the actions of that person and the denial of his right to due process.[13]  The court will also assume, as did the *Horowitz* Court, that Shah has a protected property or liberty interest in continuing his medical school education at UT Southwestern.  Even so, the court concludes that, taken in the light most favorable to Shah, the facts alleged in his complaint do not show that Shah's right to procedural due process was violated.

It is apparent that Shah is complaining of an *academic* decision rather than a *disciplinary* decision.[14]  As the court has explained above, the Due Process Clause does not require that a student be given a hearing before he is dismissed for a failure to meet academic standards.  *See Horowitz*, 435 U.S. at 90; *Davis*, 882 F.2d at 975.  Instead, a student has received all the procedural due process required where "[t]he school fully informed [him] of

_____

[13]"For there to be liability under section 1983, a defendant must have been personally involved in the conduct causing a deprivation of constitutional rights, or there must be a causal connection between the actions of that person and the constitutional right sought to be redressed."  *King v. Louisiana*, 294 Fed. Appx. 77, 83 (5th Cir. 2008) (per curiam) (citing *Lozano v. Smith*, 718 F.2d 756, 768 (5th Cir. 1983)) (affirming dismissal of claims against individual defendants, based on qualified immunity, where the allegations against these defendants failed to set forth any constitutional violation); *see also Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443 (5th Cir. 1999) ("In order to state a cause of action under § 1983, [plaintiff] must identify defendants who were either personally involved in the constitutional violation or whose acts are causally connected to the constitutional violation alleged.").

[14]The outcome would be the same even if Shah were complaining on the same grounds of a *disciplinary* decision.

the faculty's dissatisfaction with [his] clinical progress and the danger that this posed to timely graduation and continued enrollment." *Horowitz*, 435 U.S. at 85.

The allegations of Shah's complaint, taken in the light most favorable to Shah, demonstrate that he received more procedural protections than are required by the Fourteenth Amendment Due Process Clause in an academic dismissal context. UT Southwestern faculty members notified Shah that they were dissatisfied with his academic performance. The complaint alleges that, during his first internal medicine rotation, Dr. Vicioso gave him the second lowest grade possible for professionalism and interpersonal skills, stating "communication and misses innuendos or subtle actions," and observing that Shah was "resistant or defensive in accepting criticism" and was "[n]ot always comfortable interacting with others." Compl. ¶ 23. The complaint asserts that, two weeks after the feedback period for his second internal medicine rotation, Dr. Duval gave him a failing grade for the rotation "for alleged professionalism issues." *Id.* ¶ 24. Shah was also on notice, under UT Southwestern's professionalism policy, that, "after a student has three admonishments for professionalism, the SPC will meet to discus those concerns." *Id.* ¶ 27. According to the complaint, Shah "drafted a letter to the SPC based upon the advice of Dr. Mihalic and the script/format she suggested he follow," in which he accepted the charges against him, took responsibility, and suggested an improvement plan. *Id.* ¶ 28. Although Shah asserts that Dr. Mihalic's "advice was ineffective and was dismissed by the SPC," *id.*, he does not allege that the SPC failed to consider his letter. He asserts that he was permitted to appeal the SPC decision, and that he noted in his appeal that he "suffered from ADHD and his physician

- 18 -

prescribed him medical treatment and that his ability to organize and stay on task was likewise [a]ffected by both and that he w[as] going to take specific counseling for his ADHD to deal with these issues and other problems related to ADHD." *Id.* ¶ 31.  Shah alleges that his "appeal was denied without regard for his documented disability," *id.*, but he does not assert that his arguments on appeal were not considered.  Finally, Shah alleges that he was permitted to file a final appeal with the Provost and Dean.

Taken in the light most favorable to Shah, the facts alleged in his complaint do not show that a particular individual defendant deprived him of his right to procedural due process.  Instead, the allegations show that Shah was afforded "some meaningful notice and an opportunity to respond."  *Davis*, 882 F.2d at 975.[15]  The individual defendants are therefore entitled to qualified immunity dismissing Shah's § 1983-based claim for denial of his right to procedural due process.

## VI

The court now turns to the question whether the individual defendants are entitled to qualified immunity with respect to Shah's § 1983 claim alleging a denial of substantive due process.

---

[15]To the extent that Shah alleges that "Defendant failed to comply with its own polices and due process protections set forth in its University's Student Disciplinary Policy and the University Statutes," Compl. ¶ 42, "[a] student does not have any due process rights to the procedures established by a state entity's rules or regulations." *Aragona*, 2012 WL 467069, at *6 (citing *Jackson v. Tex. S. Univ.—Thurgood Marshall Sch. of Law*, 231 S.W.3d 437, 439-40 (Tex. App. 2007, pet. denied)).

A

The Supreme Court has long recognized that the Due Process Clause is more than a guarantee of procedural fairness and "cover[s] a substantive sphere as well, 'barring certain government actions regardless of the fairness of the procedures used to implement them.'" *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).  "The reach of substantive due process is limited, however, and it protects against only the most serious of governmental wrongs." *Moore v. Dall. Indep. Sch. Dist.*, 557 F.Supp.2d 755, 761 (N.D. Tex. Mar. 14, 2008) (Fitzwater, C.J.) (citation omitted). The Supreme Court has emphasized that "because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended," courts should be "reluctant to expand the concept of substantive due process." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).

In *Regents of University of Michigan v. Ewing*, 474 U.S. 214 (1985), the Supreme Court assumed the existence of a constitutionally protected property right in a student's continued enrollment in a state university and held that "decisions in the academic setting are subject to 'a narrow avenue for judicial review' under a substantive due process standard." *Wheeler v. Miller*, 168 F.3d 241, 249 (5th Cir. 1999) (quoting *Ewing*, 474 U.S. at 227).  The *Ewing* Court explained:

> When judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's professional judgment.  Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee

responsible did not actually exercise professional judgment.

*Ewing*, 474 U.S. at 225.  Accordingly, "[c]ourts must accept, as consistent with due process, 'an academic decision that is not beyond the pale of reasoned academic decision-making when viewed against the background of [the student's] entire career at the University.'" *Wheeler*, 168 F.3d at 250 (alteration in original) (quoting *Ewing*, 474 U.S. at 227-28).

The law regarding substantive due process rights in the context of higher education, however, is far from settled.  *See Burnett v. Coll. of the Mainland*, 994 F.Supp.2d 823, 828 (S.D. Tex. 2014) ("[T]he case law on whether academic decisions actually constitute a substantive due process violation is scant (the Court has found no Fifth Circuit case ever finding such a claim valid).").  The Supreme Court has twice avoided deciding whether students at a public university have a substantive due process right to continued education, assuming *arguendo* that such a right exists and concluding that no substantive due process rights were violated by the conduct alleged.  *See Ewing*, 474 U.S. at 223 (agreeing to "assume the existence of a constitutionally protectible right in [the plaintiff's] continued enrollment" (citation and internal quotation marks omitted)); *Horowitz*, 435 U.S. at 91-92 ("Even assuming that the courts can review under such a standard an academic decision of a public educational institution, we agree with the District Court that no showing of arbitrariness or capriciousness has been made in this case.").  Moreover, courts that have addressed the issue have almost universally upheld the academic decisions of public universities when challenged on substantive due process grounds.  *E.g., Ewing*, 474 U.S. at 227-28 (affirming university's decision not to allow student to retake exam even though

university had given other students opportunity to retake same exam); *Wheeler*, 168 F.3d at

250 (holding that decision to deny doctorate degree to student with poor grades did not "f[a]ll

beyond the pale of reasoned academic decision-making in light of [student's] entire academic

career."); *Chan v. Bd. of Regents of Tex. S. Univ.*, 2012 WL 5832494, at *5-6 (S.D. Tex.

Nov. 16, 2012) (granting summary judgment for law school on claim that its curved grading

system violated students' constitutional rights); *Burnett*, 994 F.Supp.2d at 828 (holding that

university's decision to end policy of letting nursing students retake final exam did not

violate students' substantive due process rights).

      As explained in *Ewing*, "[c]onsiderations of profound importance counsel restrained

judicial review of the substance of academic decisions."  *Ewing*, 474 U.S. at 225. These

considerations include a

> reluctance to trench on the prerogatives of state and local
> educational institutions and our responsibility to safeguard their
> academic freedom, a special concern of the First Amendment.
> If a federal court is not the appropriate forum in which to review
> the multitude of personnel decisions that are made daily by
> public agencies, far less is it suited to evaluate the substance of
> the multitude of academic decisions that are made daily by
> faculty members of public educational institutions—decisions
> that require an expert evaluation of cumulative information and
> [are] not readily adapted to the procedural tools of judicial or
> administrative decisionmaking.

*Id.* at 226 (citations and internal quotation marks omitted).  Thus "[w]hen judges are asked

to review the substance of a genuinely academic decision . . .  they should show great respect

for the faculty's judgment."  *Id.* at 225; *see also id.* at 225 n.11 ("'University faculties must

have the widest range of discretion in making judgments as to the academic performance of

students and their entitlement to promotion or graduation.'" (quoting *Horowitz*, 435 U.S. at

96 n. 6 (Powell, J., concurring))); *Horowitz*, 435 U.S. at 85 n.2 ("A graduate or professional

school is, after all, the best judge of its students' academic performance and their ability to

master the required curriculum."); *Senu-Oke v. Jackson State Univ.,* 283 Fed. Appx. 236, 240

(5th Cir. 2008) (per curiam) ("[C]ourts are reluctant to interfere with academic evaluations,

particularly at the higher educational levels.").

## B

In support of his substantive due process claim, Shah relies on the prior allegations

of his complaint, including those made in support of his procedural due process claim that

the court has recounted above.  But his substantive due process claim essentially rests on the

following paragraph, in which he alleges that "[t]he actions of the Defendants, as described

above, were arbitrary and capricious, and were not rationally related to any legitimate

interest."  Compl. ¶ 54.  Because the alleged actions of the individual defendants that Shah

adopts are different, the court will consider whether each particular individual defendant is

entitled to qualified immunity.

## C

The court begins with Shah's allegations against Drs. Vicioso and Duval.

## 1

Drs. Vicioso and Duval contend that, with respect to the specific question of

substantive due process challenges to faculty grading, federal and state courts have clearly

established that the professional judgment of a student's instructor is precisely the type of

academic decisionmaking that the Supreme Court has sought to protect from substantive due process challenges.  They maintain that neither of their evaluations of Shah's academic performance rises to the level of a constitutional violation or could be said to be objectively unreasonable given the clear weight of the law at the time Shah's grades were assigned.

Shah responds that the grades and comments of Dr. Vicioso were not based on his performance but instead on her personal animus toward him due to his disability and his ethnicity; that her feedback was not based on a review of his performance elicited from resident feedback and that it failed to account for his actual work product; that she did not have knowledge of his workload, patient difficulty, or how much time he spent helping the team; that she did not acknowledge his disability, which manifested itself in some of the professionalism concerns alleged; and that, in preparing her report, she refused to consult with the residents who witnessed his performance.  Shah argues that he was in good academic standing and had received positive reviews from his other instructors and peers, and that Dr. Vicioso's report was completely contrary to the observations of all of the other residents who witnessed Shah's performance.  Shah maintains that Dr. Vicioso's report was arbitrary and capricious and objectively unreasonable.

Regarding the failing grade that Dr. Duval gave him, Shah contends that, at no point during the rotation did Dr. Duval ever raise any concerns regarding his professionalism; her report was contrary to the observations of all of the other residents who witnessed his performance in his clerkship; and the failing grade was predetermined and made without regard for his performance in the rotation, based purely on the fact that Dr. Vicioso had given

- 24 -

him a low grade in his prior rotation.

2

Taken in the light most favorable to Shah, the complaint does not allege facts that show that Drs. Vicioso and Duval deprived him of his substantive due process rights when they gave him low or failing grades for his internal medicine rotation.  Assuming *arguendo* that Shah has a substantive due process right at all, the court concludes that the allegations of his complaint fail to show that the actions of Drs. Vicioso and Duval were "such a substantial departure from accepted academic norms as to demonstrate that [they] did not actually exercise professional judgment." *Ewing*, 474 U.S. at 225.

The complaint makes the following pertinent allegations regarding Drs. Vicioso and Duval:

> Despite all of the positive feedback and comments Plaintiff received from the other physicians who observed Plaintiff during his second Internal Medicine rotation and the high praise he received during his first rotation, Dr. Vicioso gave Plaintiff the lowest grades possible for his History and Physical examination skills.  For his Professionalism/Interpersonal Skill, she gave him the second lowest grade possible stating, ". . . communication and misses innuendos or subtle actions . . ." Also that he was "resistant or defensive in accepting criticism . . ." ["]. . . Not always comfortable interacting with others." These comments were not based upon Plaintiff's performance in the rotation but were based upon personal animus Dr. Vicioso harbored toward Plaintiff due to his disability and his ethnicity.
>
> Plaintiff had the next section of his Internal Medicine rotation with Dr. Duval.  At no point during the rotation did Dr. Duval ever raise any concerns regarding Plaintiff's professionalism. Even during the two feedback periods during the rotation, there was no commentary from Dr. Duval about Plaintiff having any professionalism issues.  It was not until the end of the rotation,

> two weeks after the feedback periods, that Dr. Duval gave
> Plaintiff a failing grade for the rotation for alleged
> professionalism issues.  Plaintiff believes that the basis for the
> failing grade given to him by Dr. Duval was predetermined and
> was made without regard for his performance in the rotation and
> was based purely on the fact that Dr. Vicioso gave Plaintiff a
> low grade in his prior rotation.

Compl. ¶¶ 23-24 (ellipses in original, paragraph numbers omitted).  Shah's allegations that

Dr. Vicioso's comments were based upon personal animus due to Shah's disability and

ethnicity, *id.* ¶ 23, and that he "believes" Dr. Duval's failing grade was based purely on the

fact that Dr. Vicioso had given Shah a low grade, *id.* ¶ 24, are conclusory and unsupported.

That other professors gave Shah higher grades and positive feedback does not, without more,

show that Drs. Vicioso and Duval did not actually exercise professional judgment in reaching

their decisions.  In fact, Shah's allegation that another professor (who is not a defendant) had

provided negative reviews regarding Shah's professionalism during a surgery rotation

supports instead the conclusion that the evaluations of Drs. Vicioso and Duval of Shah's

professionalism are "'not beyond the pale of reasoned academic decision-making when

viewed against the background of [the student's] entire career at the University.'"  *Wheeler*,

168 F.3d at 250 (alteration in original; ellipsis omitted) (quoting *Ewing*, 474 U.S. at 227-28).

And even if true, the mere fact that Dr. Duval did not raise any professionalism concerns

with Shah before giving him a failing grade is insufficient of itself to show that she failed to

exercise professional judgment.

Accordingly, the court concludes that the complaint is insufficient to show that Dr.

Vicioso or Dr. Duval violated Shah's right to substantive due process.

D

The court next considers whether Dr. Shah is entitled to qualified immunity as to Shah's denial of substantive due process claim.

1

Dr. Shah contends that the complaint does not show that he did not actually exercise professional judgment in evaluating Shah's professionalism issues. Dr. Shah maintains that, like the plaintiff in *Ewing*, the record indicates that Shah would not be able to succeed in medical studies or practice, and it does not show that Dr. Shah's letter to the SPC represented such a substantial departure from accepted academic norms as to demonstrate that he did not exercise professional judgment. Dr. Shah also argues that, even if this court extends current law to recognize a substantive due process claim, he would still be entitled to qualified immunity because such a constitutional violation was not clearly established law at all times relevant to Shah's complaint. Dr. Shah posits that the relevant case law indicates that any right of a student to good grades and/or continued enrollment at an academic institution is theoretical at best, and that courts have consistently ruled in favor of educators and upheld decisions regarding academic matters.

Shah responds that he need not show a published decision establishing the rights in question under precisely the same circumstances as those presented in this case, and that he has clearly alleged that Dr. Shah knew that Shah had protectable property and liberty interests in continuing his education at UT Southwestern. He argues that Dr. Shah's statements in his letter to the SPC were arbitrary and capricious because they contained

- 27 -

blatantly false or exaggerated comments regarding Shah's professionalism and were made in blind support of Drs. Vicioso and Duval's statements, of which Dr. Shah lacked any personal knowledge and that were not based on any facts but were made to appease his departmental superior, Dr. Vicioso, and to conceal the fact that his departmental junior, Dr. Duval, submitted an arbitrary and capricious report regarding Shah to the SPC.

2

As with Shah's claims against Drs. Vicioso and Duval, the complaint fails to allege facts that show that Dr. Shah did not actually exercise professional judgment in evaluating Shah's professionalism issues.  Dr. Shah is therefore entitled to qualified immunity.

Regarding whether Dr. Shah is entitled to qualified immunity from liability arising from writing the letter to the SPC in support of the assessments of Drs. Vicioso and Duval regarding Shah's professionalism, the court holds that the complaint does not show that Dr. Shah violated a clearly established right.

The inquiry into whether a right was "clearly established" at the time of the alleged conduct "must be undertaken in light of the specific context of the case, not as a broad general proposition[.]" *Saucier*, 533 U.S. at 201.  The court must determine whether "the contours of [the] right asserted are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *White v. Taylor*, 959 F.2d 539, 544 (5th Cir. 1992).  "The standard is formulated at this level of generality in order to afford the measure of protection that the doctrine is intended to confer." *Id.*  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to

a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

The allegations of the complaint are insufficient to show that Dr. Shah violated a clearly established constitutional right in writing the letter to the SPC. First, the law is not sufficiently developed such that all reasonable professors would know that, in writing a letter to the SPC "in blind support of" a colleague's assessment of a student, that professor was violating the student's clearly established substantive due process rights. *See Saucier*, 533 U.S. at 202. Second, because courts in this circuit exercise extreme deference to universities in the context of academic decisions, Dr. Shah could reasonably have believed that his actions did not violate Shah's right (assuming there was one) to substantive due process. *See Ewing*, 474 U.S. at 225-26.

The complaint also fails to show that Dr. Shah's letter to the SPC "fell beyond the pale of reasoned academic decision-making in light of [Shah's] entire academic career." *Wheeler*, 168 F.3d at 250. Shah alleges the following in support of his substantive due process claim against Dr. Shah:

> [Dr. Shah] wrote a letter to the [SPC] in support of [Dr.] Vicioso's and [Dr.] Duval's assessments and to have Plaintiff removed from medical school. [Dr.] Shah's statement made many allegations against Plaintiff that were blatantly false, were exaggerated, and were arbitrary and capricious in that his statements were made in blind support of Drs. Vicioso and Duval's statements of which he lacked any personal knowledge. [Dr.] Shah's statements were not made based upon any facts but were made to appease his departmental superior, Dr. Vicioso and to conceal the fact that his departmental junior, Dr. Duval, submitted an arbitrary and capricious report regarding Plaintiff

- 29 -

to the SPC.

Compl. ¶ 26.  The complaint asserts that Dr. Shah's statements were made to appease his departmental superior and to conceal the arbitrary and capricious report of his departmental junior.  But other than this conclusory and unsupported allegation, Shah fails to allege any facts that make this showing.  For example, Shah alleges that Dr. Shah lacked "personal knowledge" regarding his performance, but he does not allege that Dr. Shah failed to investigate the professionalism challenges and reach an independent conclusion based on his own assessment of Shah's academic records, the opinions of Shah's other professors, or any other objective measure of Shah's performance.[16]  In sum, Shah's conclusory allegation that Dr. Shah's statement was "arbitrary and capricious" and made in "blind support" of his colleagues' assessments is insufficient to show that Dr. Shah violated a clearly established constitutional right.  *See, e.g., Jackson v. Lee Coll.*, 2013 WL 4805059, at *4 (S.D. Tex. Sept. 9, 2013) ("The plaintiffs' conclusory allegations regarding the conduct of Lee College as plead in their original complaint simply do not give rise to a claim for a substantive due process violation.").

Accordingly, because the complaint does not allege facts that show that Dr. Shah

---

[16]To the extent Shah alleges Dr. Shah's letter to the SPC included statements that were "blatantly false" or "exaggerated," he has not pleaded the content of any of these statements. At a minimum, this failure precludes the court from evaluating whether the allegedly "false" or "exaggerated" statements could have been expressions of Dr. Shah's opinion.  Dr. Shah could not have violated a clearly established constitutional right by expressing to the SPC his academic opinion regarding any perceived issues with Shah's professionalism or academic performance.

violated one or more of Shah's clearly established constitutional rights when he wrote to the SPC, Dr. Shah is entitled to qualified immunity.

E

The court now considers whether Dr. Ginsburg is entitled to qualified immunity as to Shah's denial of substantive due process claim.

1

Dr. Ginsburg argues that Shah has failed to allege that Dr. Ginsburg lacked a rational basis for denying Shah's appeal and to allege any facts that show that Dr. Ginsburg did not actually exercise professional judgment in dismissing Shah's final appeal.

Shah responds that Dr. Ginsburg was made aware of the various procedural and substantive due process violations committed by Drs. Vicioso, Duval, and Shah; he had an opportunity to correct these blatant violations of Shah's due process rights on appeal, yet ignored them and denied Shah's appeal without any basis, let alone a rational basis; it is obvious that Dr. Ginsburg did not exercise any professional judgment because the appeal was denied without any rational basis; and Dr. Ginsburg's denial of his appeal without regard for the bad faith conduct of Drs. Vicioso, Duval, and Shah demonstrates that Dr. Ginsburg also acted in bad faith.

2

To determine whether Shah has plausibly alleged a substantive due process claim against Dr. Ginsburg, the court considers whether the allegations are sufficient to show that the challenged conduct "is such a substantial departure from accepted academic norms as to

demonstrate that the person or committee responsible did not actually exercise professional judgment." *Ewing*, 474 U.S. at 225.  In doing so, the court "must accept, as consistent with due process, 'an academic decision that is not beyond the pale of reasoned academic decision-making when viewed against the background of [the student's] entire career at the University.'"  *Wheeler*, 168 F.3d at 250 (quoting *Ewing*, 474 U.S. at 227-28).

Shah's conclusory and unsupported allegations against Dr. Ginsburg do not show that, in dismissing Shah's final appeal, Dr. Ginsburg did not actually exercise professional judgment.  Shah alleges that Dr. Ginsburg "denied Plaintiff's appeal without explanation," Compl. ¶ 32, but he does not allege that Dr. Ginsburg failed to consider Shah's appeal or that in denying the appeal he did not exercise professional judgment.  Moreover, considering the allegations of the complaint that Shah received the second lowest grade possible for his professionalism/interpersonal skills from Dr. Vicioso, that he received a failing grade for alleged professionalism issues from Dr. Duval, that Dr. Shah submitted a letter to the SPC recommending that Shah be dismissed, and that a surgery professor provided negative reviews regarding Shah's professionalism, the complaint itself contains allegations that negate the showing that Dr. Ginsburg's decision was "beyond the pale of reasoned academic decision-making when viewed against the background of [Shah's] entire career at [UT Southwestern]."  *Wheeler*, 168 F.3d at 250.

Accordingly, because the complaint fails to show that Dr. Ginsburg violated Shah's right to substantive due process, Dr. Ginsburg is entitled to qualified immunity.

VII

The court next considers whether the individual defendants are entitled to qualified immunity with respect to Shah's Equal Protection Clause claim.

A

The complaint alleges an Equal Protection Clause claim on the basis that Shah "was retaliated against, harassed, disciplined against, intimidated, and dismissed from the medical school, all against his will, and differently than those similarly situated medical students whose national origin is not Indian and whose first language is not English." Compl. ¶ 59.

"To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class." *Williams v. Bramer*, 180 F.3d 699, 705 (5th Cir. 1999) (quoting *Johnson v. Morel*, 876 F.2d 477, 479 (5th Cir. 1989)) (internal quotation marks omitted). "[The Supreme Court has] recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (citing *Sioux City Bridge Co. v. Dakota Cnty.*, 260 U.S. 441 (1923); *Allegheny Pittsburgh Coal Co. v. Cnty. Comm'n of Webster Cnty., W. Va.*, 488 U.S. 336 (1989)). But "if the challenged government action does not appear to classify or distinguish between two or more relevant persons or groups, then the action—even if irrational—does not deny them equal protection of the laws." *Johnson v. Rodriguez*, 110 F.3d 299, 306 (5th Cir. 1997) (quoting *Brennan v. Stewart*, 834 F.2d 1248,

- 33 -

1257 (5th Cir. 1988)) (internal quotation marks omitted).

B

The individual defendants maintain that they are entitled to qualified immunity. They contend that the weight of authority precludes Shah's class-of-one theory in the context of public education; that, even if the court permits this theory, Shah's claim fails when evaluated under the same level of deference afforded university officials in the context of substantive due process; and that Shah has failed to identify any comparator and to plead that any such comparator was similarly situated to him and treated differently. To the extent Shah bases his equal protection claim on a "protected class" theory, the individual defendants argue that Shah has failed to adequately plead such a claim; instead, the complaint merely alleges that he was treated differently from other students, but it does not assert that he was treated differently because of his national origin or native language. Finally, the individual defendants contend that, to the extent the complaint alleges that Dr. Vicioso gave Shah a low grade based on "personal animus" due to his "disability and ethnicity," the complaint pleads no actual facts to support a conclusion that either Dr. Vicioso or Dr. Duval evaluated him based on his membership in a protected class.

Shah responds that he can maintain an equal protection claim because he was dismissed from medical school based on the arbitrary and capricious and objectively unreasonable statements of Drs. Vicioso, Duval, and Shah; these false reports could not have been based upon his actual performance because he received only positive feedback from the physicians who witnessed Shah's work during his clinical rotations; and even if the

- 34 -

professionalism concerns were legitimate, the reason that his conduct led to these concerns was due to his ethnicity and manifestations of his disability.  Regarding his class-of-one theory, Shah contends that it is clear that similarly-situated students were treated more favorably than he because it cannot be the case that other students referred to the SPC with professionalism issues were not given an opportunity to defend themselves and were removed from medical school based on false allegations, as he was.

C

The individual defendants are entitled to qualified immunity with respect to Shah's equal protection claim.  To the extent the complaint alleges that Shah was discriminated against based on his national origin, he has failed to show that any of the individual defendants intentionally discriminated against him on this basis.  The only factual allegation that even mentions Shah's national origin is the allegation that Dr. Vicioso's comments regarding Shah's professionalism "were not based upon [Shah's] performance in the rotation but were based upon personal animus Dr. Vicioso harbored toward [Shah] due to his disability and his ethnicity."  Compl. ¶ 23.  But the complaint contains no factual allegation that supports a showing that Dr. Vicioso discriminated against Shah based on his ethnicity. Shah relies on nothing more than a conclusory allegation that is insufficient to overcome qualified immunity.

To the extent the complaint alleges an equal protection clause claim based on a class-of-one theory, it fails to show that any other similarly-situated UT Southwestern medical students were treated differently.  *See Hooker v. Dall. Indep. Sch. Dist.*, 2010 WL 4025877,

at *8 (N.D. Tex. Oct. 13, 2010) (Fitzwater, C.J.) (dismissing § 1983 equal protection claim where plaintiffs failed to allege that they were treated differently from others similarly situated).  The allegation that Shah was treated differently is conclusory.  *See* Compl. ¶ 59.

Accordingly, the individual defendants are entitled to qualified immunity with respect to Shah's equal protection claim.

## VIII

UT Southwestern moves under Rule 12(b)(6) to dismiss Shah's Rehabilitation Act claim.

## A

Section 504 of the Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  To qualify for relief under the Rehabilitation Act, a plaintiff must prove that (1) he is an individual with a disability; (2) who is otherwise qualified; (3) who worked for a program or activity receiving Federal financial assistance; and (4) that he was discriminated against solely by reason of his disability.  *See, e.g., Hileman v. City of Dallas, Tex.*, 115 F.3d 352, 353 (5th Cir. 1997).

## B

UT Southwestern maintains, *inter alia*, that Shah has failed to plausibly plead that his diagnosis of ADHD made him "disabled" under the statute; he has failed to plead a causal

connection between his ADHD and the alleged professionalism issues that resulted in his dismissal from medical school; he has not plausibly pleaded that he was discriminated against solely on the basis of his disability, because he has not alleged that he made anyone at UT Southwestern aware that he had been diagnosed with ADHD until he filed the final appeal of his dismissal; and that he has not pleaded that he requested a reasonable accommodation that would have permitted him to meet UT Southwestern's academic standards, and re-enrollment is not a reasonable accommodation.

Shah responds that he has adequately pleaded a qualifying disability by alleging that he suffers from ADHD; he has pleaded that he provided UT Southwestern with sufficient information that he suffered from ADHD, which substantially limits his ability to participate in the medical school curriculum, yet UT Southwestern ignored his disability, failed to consider the fact that his alleged "professionalism" violations were a direct result of his disability, and failed to provide Shah with reasonable accommodations or take his disability into account when deciding to dismiss him; and, finally, that UT Southwestern could have allowed his performance to be reevaluated in light of his known disability, or allowed an accommodation so that he could remediate the rotation.

## C

Assuming *arguendo* that Shah can meet the other essential elements of a Rehabilitation Act claim, the claim fails because Shah does not plausibly allege that he was discriminated against *solely* by reason of his disability. Although the Rehabilitation Act explicitly incorporates the ADA's standards governing complaints alleging employment

discrimination, the causation standard that governs a § 504 Rehabilitation Act claim is "whether the discrimination took place 'solely because of' the disability." *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 505 (5th Cir. 2002). The allegations of Shah's complaint directly undermine his allegation that he was dismissed "[s]olely by reason of [his] disability." Compl. ¶ 69. Shah asserts that the actions of Drs. Vicioso, Duval, and Shah—which eventually led to his dismissal—were motivated, at least in part, by other considerations. The complaint alleges that Dr. Vicioso gave Shah low grades "based upon personal animus Dr. Vicioso harbored toward [Shah] due to his disability *and his ethnicity*." *Id*. ¶ 23 (emphasis added). Shah asserts that Dr. Duval gave him a failing grade for alleged professionalism issues "based *purely on the fact that* Dr. Vicioso gave Plaintiff a low grade in his prior rotation." *Id.* ¶ 24 (emphasis added). And he contends Dr. Shah's statements to the SPC "were made to appease his departmental superior, Dr. Vicioso and to conceal the fact that his departmental junior, Dr. Duval, submitted an arbitrary and capricious report regarding [Shah] to the SPC." *Id.* ¶ 26. These allegations that factors *other than* Shah's ADHD motivated the negative professionalism reviews that ultimately resulted in Shah's dismissal from UT Southwestern preclude Shah from plausibly alleging that he was dismissed "solely by reason of" his ADHD. *See Soledad*, 304 F.3d at 505; *see also Maples v. Univ. of Tex. Med. Branch at Galveston*, 524 Fed. Appx. 93, 95 (5th Cir. 2013) (per curiam) (affirming dismissal of Rehabilitation Act claim where plaintiff claimed her ADHD caused her to receive a C in one class, but plaintiff's dismissal was based on F received in another class, and plaintiff failed to allege that F was caused by ADHD).

Accordingly, the court grants UT Southwestern's motion to dismiss Shah's Rehabilitation Act claim.

## IX

Finally, the court addresses the individual defendants' motion to dismiss Shah's IIED claims under Rule 12(b)(6) and Tex. Civ. Prac. & Rem. Code Ann. § 101.106(e).

## A

The court considers first whether the individual defendants are entitled to dismissal under § 101.106(e), a provision of the Texas Tort Claims Act. Section 101.106(e) provides that, "[i]f a suit is filed under this chapter against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit." Section 101.106(e) has been interpreted to require that the governmental unit file the motion to dismiss. "In the absence of a motion filed by the [governmental unit], [defendants] [are] not entitled to dismissal pursuant to section 101.106[(e)]." *Hernandez v. City of Lubbock*, 253 S.W.3d 750, 756 (Tex. App. 2007, no pet.); *see also Univ. of Tex. Health Sci. Ctr. at Hous. v. Crowder*, 349 S.W.3d 640, 644 (Tex. App. 2011, no pet.) ("[U]nder section 101.106(e), the governmental unit moves for dismissal of the claims against its employee; the employee does not move for dismissal.").

Although UT Southwestern and Dr. Ginsburg filed a joint motion to dismiss, the relevant portion of their motion makes clear that it is Dr. Ginsburg, not UT Southwestern, who seeks dismissal under § 101.106(e). Because UT Southwestern has not moved to dismiss the individual defendants under § 101.106(e), they are not entitled to dismissal on

- 39 -

this basis.  *See, e.g., Hernandez*, 253 S.W.3d at 756 n.9.

Accordingly, the individual defendants are not entitled to dismiss Shah's IIED claim based on § 101.106(e).

B

1

The individual defendants also move to dismiss Shah's IIED claim under Rule 12(b)(6), contending that he has not pleaded any act of an individual defendant that can plausibly be considered extreme and outrageous.  Shah responds that the conduct of Drs. Vicioso, Duval, and Shah—which resulted in his dismissal from medical school, serious damage to his reputation, loss of his chosen profession as a physician, and the stigma that is likely to follow him and preclude him from completing his medical education—was clearly extreme and outrageous.  Shah does not respond to Dr. Ginsburg's arguments regarding IIED.

2

To establish a claim for IIED under Texas law, "a plaintiff must prove that (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the emotional distress suffered by the plaintiff was severe."  *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995) (citation omitted).  To prove that the defendant's conduct was "extreme and outrageous," the plaintiff must demonstrate that the defendant's conduct was "beyond all possible bounds of decency," "atrocious," and "utterly intolerable

in a civilized society." *Tex. Farm Bureau Mut. Ins. Cos. v. Sears*, 84 S.W.3d 604, 610 (Tex.

2002) (quoting *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993)) (internal quotation

marks omitted). "Conduct that is merely insensitive or rude is not extreme and outrageous."

*Id.* (quoting *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 612 (Tex. 1999)). "Likewise, 'mere

insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not rise to

the level of extreme and outrageous conduct.'" *Id.* (citing *GTE Sw.*, 998 S.W.2d at 612).

"Initially, the court must decide 'whether the defendant's conduct may reasonably be

regarded as so extreme and outrageous as to permit recovery.'" *Id.* (quoting *Wornick Co. v.

Casas*, 856 S.W.2d 732, 734 (Tex. 1993)). "Only when reasonable minds may differ is it for

the jury, 'subject to the court's control, to determine whether, in the particular case, the

conduct has been sufficiently extreme and outrageous to result in liability.'" *Id.* (quoting

*GTE Sw.*, 998 S.W.2d at 616).

Shah alleges that Dr. Vicioso gave him low grades for professionalism based on

personal animus due to Shah's disability and ethnicity; Dr. Duval gave him a failing grade

for his internal medicine rotation based purely on the fact that Dr. Vicioso gave him a low

grade in his prior rotation; Dr. Shah wrote a letter to the SPC in support of the

recommendations of Drs. Vicioso and Duval and containing allegations that were blatantly

false, exaggerated, and made in blind support of his colleagues' statements of which he

lacked any personal knowledge; and Dr. Ginsburg denied his appeal without explanation.

The court concludes that these allegations are insufficient to plausibly allege the type of

"extreme and outrageous" conduct required to establish IIED. *See, e.g., Creditwatch, Inc.*

*v. Jackson*, 157 S.W.3d 814, 818 (Tex. 2005) ("We certainly understand judicial reticence to dismiss claims like this one stemming from heinous acts.  But except in circumstances bordering on serious criminal acts, we repeat that such acts will rarely have merit as intentional infliction claims.").  Because Shah has failed to plead conduct that borders on "serious criminal acts," *id.*, or that was "beyond all possible bounds of decency," "atrocious," and "utterly intolerable in a civilized society," *Sears*, 84 S.W.3d at 610 (quoting *Twyman*, 855 S.W.2d at 621) (internal quotation marks omitted), the court grants the individual defendants' motion to dismiss Shah's IIED claim.[17]

## X

In his response briefs, Shah requests leave to amend if the court is inclined to grant

---

[17]Because Shah may consider asserting a claim for IIED in an amended complaint, the court notes another fundamental problem with such a claim.  In *Hoffmann-LaRoche Inc. v. Zeltwanger*, 144 S.W.3d 438 (Tex. 2004), the Supreme Court of Texas reiterated that IIED was originally recognized to be a "'gap-filler' tort, judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Id.* at 447.  Therefore,

> [u]nder Texas law, a plaintiff may not bring an IIED claim when other statutory remedies are available for the underlying conduct.  IIED is a gap-filler tort never intended to supplant or duplicate existing statutory or common-law remedies.  Even if other remedies do not explicitly preempt the tort, their availability leaves no gap to fill.

*Jones v. Dallas County*, 2013 WL 6388441, at *7 (N.D. Tex. Dec. 6, 2013) (Fitzwater, C.J.) (citations and internal quotation marks omitted).  Accordingly, to the extent that Shah maintains that other statutory or common-law remedies are available against a defendant, a claim for IIED is not available against that defendant.

defendants' motions to dismiss.  Because the court's usual practice when granting a motion to dismiss is to permit a plaintiff at least one opportunity to replead, the court will give Shah an opportunity to amend his complaint.  *See In re Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d 552, 567-68 (N.D. Tex. 2005) (Fitzwater, J.) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.").  He must do so within 28 days of the date this memorandum opinion and order is filed.

*     *     *

For the foregoing reasons, the court grants UT Southwestern's Rule 12(b)(1) motion to dismiss Shah's claims under § 1983 and Title III of the ADA and for breach of contract, and IIED based on Eleventh Amendment immunity; grants UT Southwestern's Rule 12(b)(6) motion to dismiss Shah's Rehabilitation Act claim; grants the individual defendants' motions to dismiss Shah's § 1983 claims based on the doctrine of qualified immunity; grants the individual defendants' motion to dismiss Shah's IIED claim; and grants Shah leave to replead.

**SO ORDERED.**

October 20, 2014.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE