IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| VARUN SHAH, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:13-CV-4834-D |
| VS. | § | |
| | § | |
| UNIVERSITY OF TEXAS | § | |
| SOUTHWESTERN MEDICAL | § | |
| SCHOOL, et al., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

Following the filing of a memorandum opinion and order that addressed the merits of this lawsuit and of plaintiff's complaint, the court returns to this lawsuit brought by a plaintiff who asserts that he was disciplined and then dismissed from medical school in violation of his constitutional rights to procedural and substantive due process. Two defendants move to dismiss plaintiff's first amended complaint ("amended complaint") under Fed. R. Civ. P. 12(b)(1) and (6), presenting questions of constitutional standing and sovereign immunity, and whether plaintiff has pleaded a plausible claim on which relief can be granted. Although the court concludes that plaintiff has constitutional standing and that his suit is not barred by sovereign immunity, it holds that his amended complaint fails to state a claim on which relief can be granted. The court therefore grants defendants' motion to dismiss under Rule 12(b)(6)

and dismisses this action against them by Rule 54(b) judgment filed today.[1]

I

A

Because this case is the subject of a prior memorandum opinion and order, *Shah v. University of Texas Southwestern Medical School*, 54 F.Supp.3d 681 (N.D. Tex. 2014) (Fitzwater, C.J.) ("*Shah I*"), the court will limit its discussion of the background facts and procedural history to what is pertinent to this decision.  Plaintiff Varun Shah ("Shah") was enrolled as a medical student at defendant University of Texas Southwestern Medical Center ("UT Southwestern")[2] until he was dismissed at the end of his third year pursuant to UT Southwestern's Professionalism Policy ("Policy").[3]  Under the Policy, adopted in May 2010,

_____

[1]The court concludes that this memorandum opinion and order need not be sealed. Although the appendix to Shah's amended complaint has been filed under seal, the briefing on defendants' motion has not been filed under seal.  And while this memorandum opinion and order cites parts of the appendix that include criticisms of Shah as a medical student, they are not substantially different from what has already been disclosed in the court's prior memorandum opinion and order addressed to Shah's complaint.

[2]Shah refers to UT Southwestern as "University of Texas Southwestern Medical School." *See, e.g.,* Am. Compl. 1.  In their brief in support of their motion to dismiss, defendants refer to UT Southwestern as "University of Texas Southwestern Medical Center," Ds. Br. 1, and they point out that Shah "continues to incorrectly identify the name of the institution as 'University of Texas Southwestern Medical School,'" *id.* at 1 n.1., and they renew their "prior request that the caption of this action be amended to correctly identify it as University of Texas Southwestern Medical Center," *id.*  The court will refer to UT Southwestern by the name used in defendants' brief.  It will continue to use the case caption assigned by the clerk of court, unless defendants separately move to change the case caption and the court grants the motion.

[3]In deciding defendants' Rule 12(b)(6) motion, the court construes Shah's amended complaint in the light most favorable to him, accepts as true all well-pleaded factual allegations, and draws all reasonable inferences in his favor. *See, e.g., Lovick v. Ritemoney*

- 2 -

Physicianship Evaluation Forms ("PEFs") are issued for clinical students (i.e., students in their third and fourth years) who "do not demonstrate adequate professional and personal attributes." Am. Compl. Ex. B at 9. The Policy provides that "[s]tudents who receive two or more [PEFs] in the clinical years will be placed on academic probation and can be referred to the Student Promotions Committee (["SPC"]) for review of the deficiencies. The SPC can recommend dismissal." *Id.*

On July 2, 2012 James Wagner, M.D. ("Dr. Wagner"), the Associate Dean at UT Southwestern, issued Shah a PEF ("July 2012 PEF"), allegedly because Shah "waited too long" to request permission to begin his third year of medical school without first taking a national exam.[4] Am. Compl. ¶ 4.56. Shah alleges that there was no "hard and fast deadline"

─────────────────────────

*Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004). "The court's review [of a Rule 12(b)(6) motion] is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citation omitted).

A Rule 12(b)(1) motion can mount either a facial or factual challenge. *See, e.g., Hunter v. Branch Banking & Trust Co.*, 2013 WL 607151, at *2 (N.D. Tex. Feb. 19, 2013) (Fitzwater, C.J.) (citing *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. May 1981)). When a party makes a Rule 12(b)(1) motion without including evidence, the challenge to subject matter jurisdiction is facial. *Id.* The court assesses a facial challenge as it does a Rule 12(b)(6) motion in that it "looks only at the sufficiency of the allegations in the pleading and assumes them to be true. If the allegations are sufficient to allege jurisdiction, the court must deny the motion." *Id.* (citation omitted) (citing *Paterson*, 644 F.2d at 523).

[4]According to the amended complaint, there is no rule that sets a specific date by which a medical student must take certain national exams. Students are encouraged to take the national exam before their third year of medical school, but they can request permission to delay the start of their third year to allow more time to study, and students can be approved to start their third year without taking the exam, provided they take the exam sometime during the third year.

to request additional time to take the exam, and that had he been notified that not requesting more time would result in a PEF, he would have taken the exam earlier, or made his request for more time sooner.

The following spring, defendant Belinda Vicioso, M.D. ("Dr. Vicioso") was the instructor for one of Shah's internal medicine clinical rotations. Shah alleges that, during the two-week rotation, he turned in a very detailed, comprehensive "write-up" on a patient, but Dr. Vicioso refused to read it because Shah had requested a few more hours to research his patient's symptoms. Dr. Vicioso instead ordered Shah to prepare overnight a second write-up on a new patient. Shah did as he was instructed, but Dr. Vicioso rejected the second write-up without reading it, stating that it was "sloppy" because it contained typos, and the formatting of the first page was skewed. Rather than work with Shah to improve the two write-ups he had submitted, Dr. Vicioso ordered Shah to evaluate an entirely new patient and submit a third write-up near the end of his rotation. The third patient was assigned to Shah when only three days remained in the rotation. The patient was delirious when first admitted, and she could not communicate with Shah until the following day. With only two days remaining in the rotation, Shah wrote a short, five-page report. He was in the process of writing a more detailed, comprehensive write-up when, on the last day of the rotation, Dr. Vicioso suddenly and without warning loudly proclaimed to Shah in a public hallway that she was giving him a failing grade and was going to write up a PEF because he had not yet submitted the third write-up, even though the third write-up was not yet due.

The following Monday, the course/clerkship director, Amit Shah, M.D. ("Dr. Shah"),

called Shah into his office and informed him that he agreed with Dr. Vicioso, that Shah would fail the rotation, and that Dr. Shah was filing the PEF ("March 2013 PEF").  Shah contends that Dr. Shah failed to conduct a full investigation on the merits before issuing the PEF and, instead, "rubber-stamp[ed]" Dr. Vicioso's recommendation.  *Id.* ¶ 4.36.  Approximately two months later, Dr. Shah wrote a letter to the SPC ("May 2013 Letter") detailing the "meetings and discussions regarding professionalism issues . . . that arose during [Shah's] internal medicine rotation."  Am. Compl. Ex. C at 1.  Dr. Shah stated that because this was Shah's second PEF, he "knew that it would come before the SPC and completed a thorough investigation to assist members of the committee in making a decision about next steps for [Shah]."  *Id.*  Before submitting it to the SPC, Dr. Shah did not inform Shah that he was submitting the letter, did not give him a copy of the letter, and did not give him an opportunity to respond.

The SPC decided to dismiss Shah from UT Southwestern.  Patricia Bergen, M.D. ("Dr. Bergen"), who had issued a negative clinical evaluation form during Shah's pre-clinical years, was the head of the SPC committee that decided to dismiss Shah.  Although Shah filed an appeal, he alleges that "the appellate process was a[] sham" because the appellate committee was composed of the same people who were on the committee that voted to dismiss him.  Am. Compl. ¶ 4.71.

B

Shah filed this lawsuit against UT Southwestern and various members of the UT Southwestern faculty in their individual capacities.  He alleged claims against all defendants

under 42 U.S.C. § 1983 (for violations of his rights to procedural due process, substantive due process, and equal protection) and under Texas law, and alleged claims against only UT Southwestern for violating § 504 of the Rehabilitation Act, violating Title III of the Americans with Disabilities Act ("ADA"), and for breach of contract under Texas law. Defendants moved to dismiss under Rules 12(b)(1), 12(b)(6), and Tex. Civ. Prac. & Rem. Code Ann. § 101.106 (West 2011).  The court granted UT Southwestern's Rule 12(b)(1) motion to dismiss Shah's § 1983, ADA, breach of contract, and intentional infliction of emotional distress ("IIED") claims based on Eleventh Amendment immunity; granted UT Southwestern's Rule 12(b)(6) motion to dismiss Shah's Rehabilitation Act claim; granted the individual defendants' motions to dismiss Shah's § 1983 claims based on qualified immunity; granted the individual defendants' Rule 12(b)(6) motions to dismiss Shah's IIED claim; and granted Shah leave to replead.  *Shah I*, 54 F.Supp.3d at 707.

Shah has filed his amended complaint in which he names as defendants UT Southwestern and J. Gregory Fitz, M.D. ("Dean Fitz") and Drs. Bergen, Vicioso, and Shah (collectively, the "Individual Defendants"), suing the Individual Defendants only in their official capacities.  Shah alleges that, "as applied," the Policy is unconstitutional because it violates his substantive due process rights, and that even if the Policy itself is not unconstitutional, his dismissal is invalid because defendants failed to provide him the procedural due process required for a disciplinary dismissal.  Shah seeks, *inter alia*, "a judicial declaration that his dismissal is invalid, and injunctive relief preventing Defendants from disseminating this information to any other universities."  Am. Compl. ¶ 6.3; *see also*

*id.* ¶ 6.6.

UT Southwestern and Dean Fitz[5] move to dismiss Shah's amended complaint under Rules 12(b)(1) and 12(b)(6).  Shah opposes the motion.

II

"Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998).  "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction.  Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam) (citations omitted).

"In deciding a Rule 12(b)(6) motion to dismiss, the court evaluates the sufficiency of [the plaintiff's] . . . complaint by 'accepting all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Bramlett v. Med. Protective Co. of Fort Wayne, Ind.*, 855 F.Supp.2d 615, 618 (N.D. Tex. 2012) (Fitzwater, C.J.) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks and brackets omitted)).  To survive defendants' motion, Shah must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

---

[5]According to UT Southwestern and Dean Fitz, Drs. Bergen, Vicioso, and Shah have not yet been served with process, and, accordingly, have not joined in the motion.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*(quoting *Twombly*, 550 U.S. at 556); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]"). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Rule 8(a)(2)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678 (citation omitted).

### III

Defendants move under Rule 12(b)(1) to dismiss Shah's constitutional claims on the ground that he lacks standing to pursue them.[6]

### A

The standing doctrine addresses the question of who may properly bring suit in federal court, and "is an essential and unchanging part of the case-or-controversy requirement of Article III."[7] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). It "involves both

---

[6]"When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming*, 281 F.3d at 161 (citations omitted).

[7]"Standing is an issue of subject matter jurisdiction, and thus can be contested by a Rule 12(b)(1) motion to dismiss." *Lee v. Verizon Commc'ns Inc.*, 954 F.Supp.2d 486, 496 (N.D. Tex. 2013) (Fitzwater, C.J.) (citing *Hunter*, 2013 WL 607151, at *1), *aff'd*, ___ Fed. Appx. ___, 2015 WL 4880972 (5th Cir. Aug. 17, 2015). A Rule 12(b)(1) motion can mount

constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To establish standing, a plaintiff must meet both constitutional and prudential requirements. *See, e.g., Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 560 (5th Cir. 2001). Defendants contend that Shah lacks constitutional standing, which requires that a litigant establish three elements: (1) an injury-in-fact that is concrete and actual or imminent, not hypothetical; (2) a fairly traceable causal link between the injury and the defendants' actions; and (3) that the injury will likely be redressed by a favorable decision. *See, e.g., Bennett v. Spear*, 520 U.S. 154, 162 (1997); *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009).

### B

Defendants contend that Shah cannot meet the "injury-in-fact" requirement of constitutional standing because, although the actions challenged in the amended complaint are indisputably related to Shah's experience as a student at, and dismissal from, UT Southwestern, the injunctive relief he seeks is tied solely to UT Southwestern's ability to share his history at UT Southwestern. They posit that the relief Shah seeks—a declaration

---

either a facial or factual challenge. *See Hunter*, 2013 WL 607151, at *2 (citing *Paterson*, 644 F.2d at 523). When a party makes a Rule 12(b)(1) motion without including evidence, the challenge to subject matter jurisdiction is facial. *Id.* The court assesses a facial challenge as it does a Rule 12(b)(6) motion in that it "looks only at the sufficiency of the allegations in the pleading and assumes them to be true. If the allegations are sufficient to allege jurisdiction, the court must deny the motion." *Id.* at *2 (citing *Paterson*, 644 F.2d at 523). In this case, defendants are making a facial challenge to subject matter jurisdiction. Accordingly, the court examines only the sufficiency of the allegations in the amended complaint and assumes that they are true.

- 9 -

that UT Southwestern's decisions were invalid and an injunction intended to prevent UT

Southwestern from disseminating this information to other universities—is tied to an event

that has not yet occurred, and will not occur unless Shah seeks admission to another

institution.  Defendants therefore contend that because Shah has failed to tie his requested

relief to an actual or threatened legal injury, he has not satisfied the injury-in-fact component

of standing, and his case should be dismissed under Rule 12(b)(1).

Defendants also maintain that Shah cannot meet the "redressability" requirement of

constitutional standing because he does not seek relief that would be available if he prevailed

on his procedural due process claim—i.e., prospective injunctive relief compelling the state

actor to provide him the requisite process.  Regarding Shah's substantive due process claim,

defendants contend that his

> disjointed requests for relief create two jurisdictional
> deficiencies: first, so long as he does not seek reinstatement to
> the University, Plaintiff has no interest whatsoever in the
> prospective application of the [Policy,] . . . [and s]econd,
> Plaintiff's requested relief does nothing to address his alleged
> injury with respect to the various alleged constitutional
> deprivations of his rights.

Ds. Br. 18.

Shah responds that he has challenged the constitutionality of the Policy, which has

already actually harmed him because it was applied in an unconstitutional manner that

resulted in the issuance of three PEFs and dismissal from medical school; it is undisputed that

he will not be able to transfer to another accredited medical school unless he is in good

standing and eligible for promotion at his current school, and does not have any academic

or non-academic charges against him; and UT Southwestern has already harmed his liberty and property interest in continuing his medical school education, and, regardless whether UT Southwestern does additional harm in the future, it has already harmed his professional reputation.

In response to defendants' "redressability" arguments, Shah contends that, in addition to injunctive relief, he is also requesting a declaration that the Policy is unconstitutional as applied, and that, if the court rules that the Policy was applied in an unconstitutional manner, this will result in a further declaration that the PEFs issued against him were invalid and that his dismissal was invalid. Shah maintains that the net result of these declarations will be that he is a student in "good standing," and UT Southwestern will not be allowed to disseminate the fact of his previous dismissal (which will be expunged) to other universities.

Defendants reply that Shah has failed to identify any ongoing violation of federal law that would invoke the exception to the state's sovereign immunity provided by *Ex parte Young*, 209 U.S. 123 (1908); that Shah is relying on a perceived threat that defendants may, upon a triggering event (such as Shah's application to another school) release his transcript, which will reflect his current status, but that there is nothing actionable about this perceived threat so long as he does not seek injunctive relief that would place him back with the University as a student; and that enjoining UT Southwestern will not address his allegation that UT Southwestern's past dismissal of him was unconstitutional.

C

The court concludes that Shah has adequately pleaded constitutional standing.

1

Shah alleges that he has standing to bring his federal due process claims because

> even though the University has not yet disseminated the
> information regarding the two PEF[s] and his dismissal to third
> parties, there is an imminent threat that the Defendants will do
> so, and thus harm his professional reputation, as soon as Student
> Shah applies for admission to other Universities.  Student Shah
> is currently being harmed because he cannot apply to other
> medical schools while his record still shows a dismissal. . . .
> [Student] Shah is about to start applying to other universities,
> but is waiting on the outcome of this litigation first.

Am. Compl. ¶ 7.1.  Defendants contend that because Shah has not yet applied to another

medical school and UT Southwestern has not yet shared Shah's history with any other

medical school, Shah has not yet suffered a constitutional injury.  The court disagrees.

Courts "have generally permitted future events which are sufficiently likely to occur

to serve as a basis for standing when the plaintiffs, as here, are seeking injunctive relief."

*K.P. v. LeBlanc*, 627 F.3d 115, 122 (5th Cir. 2010).  To obtain injunctive relief, a plaintiff

must be "likely to suffer future injury."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 105

(1983).  "Past exposure to illegal conduct does not in itself show a present case or

controversy regarding injunctive relief[.]"  *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974).

The threat of future injury to the plaintiff "must be both real and immediate, not conjectural

or hypothetical."  *Lyons*, 461 U.S. at 102 (quotation marks omitted).

Shah alleges that he intends to apply to other medical schools, but is awaiting the

- 12 -

outcome of this litigation because "he cannot apply to other medical schools while his record still shows a dismissal."  Am. Compl. ¶ 7.1.  In his response to defendants' motion, he maintains that "[i]t is undisputed that [he] will not be able to transfer to another accredited medical school unless he is in 'good standing' at his current school, is 'eligible for promotion' at his current school, and does not have any academic or nonacademic charges against him." P. Br. 2; *see also* Am. Compl. ¶ 4.47 ("When Student Shah applies for admission into other medical schools, the University will certainly send a notice to the new medical school that Student Shah was dismissed and explain why.  This, of course, spells the death of Student Shah's professional reputation, and thus, his career in medicine.").  In order to have suffered a constitutional injury-in-fact, Shah is not required to apply to, and be rejected by, another medical school.  Rather, he can pursue his claim for injunctive relief provided he alleges a "real and immediate threat of future injury" that is not merely conjectural.  *See K.P.*, 627 F.3d at 122.  He has satisfied this requirement by pleading that he is "about to start" applying to other universities, Am. Compl. ¶ 7.1, and that, once he does so, defendants will disclose information regarding his two PEFs and dismissal, resulting in harm to his professional reputation and preventing him from being accepted at another medical school.  The threat of harm that Shah has pleaded is not merely hypothetical or conjectural.

Accordingly, the court holds that Shah has adequately pleaded the injury element of constitutional standing.

2

Shah has also adequately pleaded that his injury will likely be redressed by a favorable decision.  *See Lujan*, 504 U.S. at 561.

In his amended complaint, Shah seeks the following relief: (1) a declaration that the Policy is unconstitutional as applied; (2) a declaration that the July 2012 and March 2013 PEFs are invalid because they were based on the unconstitutional application of the Policy; (3) a declaration that his dismissal is invalid because it was the result of an unconstitutional application of the Policy [(c) and (d)]; (4) an injunction preventing UT Southwestern from disseminating his academic records; and (5) an injunction ordering UT Southwestern to expunge the false, inaccurate, and defamatory statements from his academic records and to expunge the fact of his dismissal.  Am. Compl. ¶ 10.1.  According to Shah's brief,

> [i]f the Court rules that the Policy was applied in an unconstitutional manner, this will result in a further declaration that the PEF[s] issued against him were invalid and that the dismissal was invalid.  The net result will be that Shah will be a student in "good standing," and the University will not be allowed to disseminate the fact of his previous dismissal (which will be expunged) to other universities.

P. Br. 5-6 (citations omitted).

The court concludes that Shah's alleged injury—the inability to transfer to another medical school because his academic records at UT Southwestern reflect a dismissal—will be redressed by the declaratory and injunctive relief that he seeks.  In his amended complaint, Shah requests very specific injunctive and declaratory relief.  If he prevails on his constitutional claims and obtains this requested relief, his academic record will be "wiped

clean," and his dismissal from UT Southwestern will no longer prevent his acceptance (on the basis of his dismissal) as a transfer student into another medical school.

Defendants contend that Shah's request for relief creates two jurisdictional deficiencies:

> first, so long as he does not seek reinstatement to the University, Plaintiff has no interest whatsoever in the prospective application of the University's Professionalism Policy (or any other policy for that matter). Second, Plaintiff's requested relief does nothing to address his alleged injury with respect to the various alleged constitutional deprivations of his rights.

Ds. Br. 18. The court disagrees with defendants' position. First, Shah intends to apply for admission to other medical schools. In order to obtain relief in the form of a clean academic record that does not reflect the two PEFs and dismissal from medical school, Shah challenges the validity of the Policy as applied to him. It is irrelevant whether Shah has or does not have an interest in the prospective application of the Policy because he has an interest in challenging how the Policy was applied to him, how this affected his academic record, and how his dismissal (arising from the application of the Policy) will impact his ability to transfer to another medical school. The relief he requests, both declaratory and injunctive, will redress *his* alleged injury, which is all that is required to satisfy the redressability element of constitutional standing. Concerning defendants' second alleged "jurisdictional deficiency," the court concludes for the reasons explained above that the relief Shah requests *would* redress his alleged injury.

The court concludes that Shah has adequately pleaded that his injury will likely be

redressed by a favorable decision, thereby satisfying the redressability element of constitutional standing.

D

The court holds that defendants are not entitled to dismiss Shah's claims based on lack of constitutional standing.

IV

Defendants do not move to dismiss this action based on sovereign immunity.  In their reply brief, however, they contend that Shah has failed to identify "an *ongoing* violation of federal law that would invoke the exception to the state's sovereign immunity provided by *Ex parte Young*[,] 209 U.S. 123 (1908)."  Ds. Reply Br. 2.  Although the court's usual practice is to decline to consider arguments raised for the first time in a reply brief, *see Springs Industries, Inc. v. American Motorists Insurance Co.*, 137 F.R.D. 238, 239 (N.D. Tex. 1991) (Fitzwater, J.) (noting "the court's practice of declining to consider arguments raised for the first time in a reply brief"), because the court concludes that Shah's claims against the Individual Defendants are *not* barred under *Ex parte Young*, the court will address this issue.

A

The Eleventh Amendment provides that "'[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.'"  *Shah I*, 54 F.Supp.3d at 689 (quoting the Eleventh Amendment).  The

- 16 -

Eleventh Amendment bars private suits in federal court against states, including state agencies, unless the state has waived, or Congress has abrogated, the state's sovereign immunity. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-100 (1984); *Aguilar v. Tex. Dep't of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998). The reference to actions "against one of the United States" has been interpreted to "encompass[] not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities." *Sw. Bell Tel. Co. v. City of El Paso*, 243 F.3d 936, 937 (5th Cir. 2001) (quoting *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997)).

The Supreme Court has recognized "only two circumstances in which an individual may sue a State. First, Congress may authorize such a suit in the exercise of its power to enforce the Fourteenth Amendment. . . . Second, a State may waive its sovereign immunity by consenting to suit." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999).[8] Shah sues UT Southwestern alleging violations of the Due Process Clause of the Fourteenth Amendment, which prohibits states from, *inter alia*, "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In 42 U.S.C. § 1983, Congress created a federal cause of action for, *inter alia*, "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."[9] It is well-settled, however, that states and state agencies are not "persons" subject

---

[8]There is no suggestion here that the second circumstance applies.

[9]Shah has not pleaded a claim under 42 U.S.C. § 1983. But because the Due Process Clause of the Fourteenth Amendment does not itself authorize a cause of action, the court

to suit under § 1983. *Cheramie v. Tucker*, 493 F.2d 586, 587 (5th Cir. 1974).[10]

Ordinarily, when public employees are sued in their official capacities, they are entitled to the same immunity enjoyed by the State, because an official capacity claim is asserted "against the official's office" and "is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citations omitted). In *Ex parte Young*, however, the Supreme Court "recognized an important exception to this general rule: a suit challenging the constitutionality of a state official's action is not one against the State." *Pennhurst*, 465 U.S. at 102. In other words, "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will*, 491 U.S. at 71 n.10 (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)).

Under *Ex parte Young* and its progeny, Eleventh Amendment immunity does not bar

---

assumes that Shah intends to assert his due process claims under § 1983. *See Hearth, Inc. v. Dep't of Pub. Welfare*, 617 F.2d 381, 382-83 (5th Cir. 1980) (per curiam) (holding that "the federal courts, and this Circuit in particular, have been hesitant to find causes of action arising directly from the Constitution," and noting that 42 U.S.C. § 1983 provides the means for seeking relief against a state actor who violates the Constitution); *see also Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001) ("[A] litigant complaining of a violation of a constitutional right does not have a direct cause of action under the United States Constitution but must utilize 42 U.S.C. § 1983."); *Wax 'n Works v. City of St. Paul*, 213 F.3d 1016, 1019 (8th Cir. 2000) (holding that a "claim may not be brought directly under the [F]ourteenth [A]mendment").

[10]The court held in *Shah I* that Shah's § 1983, ADA, breach of contract, and IIED claims against UT Southwestern are barred by Eleventh Amendment immunity. *Shah I*, 54 F.Supp.3d at 690. The question presented in defendants' reply brief, however, pertains to whether under *Ex parte Young* Eleventh Amendment immunity applies.

- 18 -

suits "brought against individual persons in their official capacities as agents of the state, [where] the relief sought [is] declaratory or injunctive in nature and prospective in effect." *Aguilar*, 160 F.3d at 1054. Thus "to avoid an Eleventh Amendment bar by means of *Ex parte Young*, 'a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Cantu Servs., Inc. v. Roberie*, 535 Fed. Appx. 342, 344-45 (5th Cir. 2013) (alteration in original) (quoting *Va. Office for Prot. & Advocacy v. Stewart*, ___ U.S. ___, 131 S.Ct. 1632, 1639 (2011)).

B

Shah brings his federal due process claims against the Individual Defendants only in their official capacities. And the relief he seeks is clearly prospective in effect: declaratory and injunctive relief that, *inter alia*, would require UT Southwestern to remove from his academic record any references to his allegedly unconstitutional dismissal and prevent UT Southwestern from disseminating information regarding his dismissal to other universities. *See, e.g., Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (holding that state university student's request for injunctive relief clearing his school record of past violations was prospective because injunctions "serve the purpose of preventing present and future harm").

Defendants contend that the allegedly unconstitutional acts on which Shah bases his constitutional claims "took place in the past and . . . there is no attempt to show that any of these alleged discreet acts of Defendants, even if believed, are ongoing such that injunctive relief would be in order." Ds. Reply Br. 2. Defendants are correct that, to satisfy *Ex parte*

- 19 -

*Young*, Shah is required to show that the allegedly unconstitutional acts "w[ere] not a 'one-time, past event' but an ongoing violation." *Cantu*, 535 Fed. Appx. at 345 (citing *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 510 (6th Cir. 2008)).  The premise of *Ex parte Young* is that remedies designed to end a continuing violation of federal law vindicate the federal interest in assuring the supremacy of federal law.  *See Pennhurst*, 465 U.S. at 102.  Thus the Court held in *Ex parte Young* that "relief that serves directly to bring an end to a *present* violation of federal law is not barred by the Eleventh Amendment[.]" *Papasan v. Allain*, 478 U.S. 265, 278 (1986) (emphasis added).

> [*Ex parte*] *Young* has been focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past, as well as on cases in which the relief against the state official directly ends the violation of federal law as opposed to cases in which that relief is intended indirectly to encourage compliance with federal law through deterrence or directly to meet third-party interests such as compensation. . . . "Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law.   But compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment."

*Id.* at 277-78 (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)).

Shah contends that his property and liberty interests in his professional reputation are "currently being harmed" because he cannot apply to other medical schools due to an imminent threat that defendants will disseminate to third parties information regarding the two PEFs and his dismissal from UT Southwestern.  Am. Compl. ¶ 7.1.  In other words, he alleges that defendants are continuing to deprive him of his constitutionally-protected liberty

- 20 -

and property interests because, when he applies for admission into other medical schools, defendants will send notice to the schools that he was dismissed, which will prevent his acceptance into another medical school, further depriving him of his protected liberty and property interests.  Thus this case is unlike one in which the plaintiff alleged a continuing *injury*, but the *constitutional violation* was a discrete act that took place only in the past.  *See, e.g., Cantu*, 535 Fed. Appx. at 345 (holding that while complaint on its face sought prospective relief, as required under *Ex parte Young*, it did not allege an ongoing federal law violation, i.e., that state law officials were continuing to infringe a constitutionally protected interest, and therefore there was "no ongoing violation of law remediable by prospective relief under *Ex parte Young*"); *Black Farmers & Agriculturists Ass'n, Inc. v. Hood*, 2014 WL 935147, at *5 (S.D. Miss. Mar. 10, 2014) (holding that plaintiffs' allegation that they continued to suffer harm from allegedly misleading and defamatory comments published in press release was insufficient to allege ongoing violation of constitutional rights sufficient to satisfy *Ex parte Young*).  In the present case, Shah alleges that defendants' threatened behavior will continue to deprive him of his constitutional rights.  *See, e.g., Shepard v. Irving*, 77 Fed. Appx. 615, 620 (4th Cir. 2003) (holding that *Ex parte Young* exception applied to claims by student seeking to expunge failing grade and plagiarism conviction because failing grade and plagiarism conviction "would constitute a continuing injury to the plaintiff," the "requests for expungement would relate to an ongoing violation of federal law[,] and the relief granted would be prospective in nature."); *Malkan v. Mutua*, 2012 WL 4722688, at *7 (W.D.N.Y. Oct. 3, 2012) (holding that university professor's official-capacity

- 21 -

claim against dean of law school for clearing of his personnel file of any wrongful disciplinary actions was permitted under *Ex parte Young* because "the existence of derogatory information in the plaintiff's personnel file, if found to be the result of a violation of due process, would be an ongoing violation of federal law.").

Applying *Ex parte Young*, the court concludes that Shah's claims for prospective relief against the Individual Defendants in their official capacities are not barred by Eleventh Amendment immunity.[11]

V

Having determined that Shah's claims against UT Southwestern and the Individual Defendants are not subject to dismissal under Rule 12(b)(1) for a lack of standing or based on Eleventh Amendment immunity, the court turns to defendants' motion under Rule 12(b)(6).

A

Defendants move to dismiss Shah's procedural due process claim, contending that *Shah I* holds that his dismissal was academic, not disciplinary, and citing *Shah I*'s conclusion that "[t]he allegations of Shah's complaint, taken in the light most favorable to Shah, demonstrate that he received more procedural protections than are required by the Fourteenth Amendment Due Process Clause in an academic dismissal context." *Shah I*, 54 F.Supp.3d

---

[11]"In order to use the *Ex Parte Young* exception, a plaintiff must demonstrate that the state officer has 'some connection' with the enforcement of the disputed act." *K.P.*, 627 F.3d at 124 (citation omitted). Defendants do not raise this issue, so the court will not consider it at this time.

at 694.  Defendants contend that Shah's amended complaint does not plead facts that require

a different result regarding Shah's procedural due process claim, and that he has failed to

plausibly allege that he was not provided with constitutionally sufficient notice or an

opportunity to be heard with respect to his dismissal from UT Southwestern.

B

"Procedural due process imposes constraints on governmental decisions which deprive

individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause

of the Fifth or Fourteenth Amendment."  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

In *Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78 (1978), the Supreme

Court of the United States assumed, without deciding, that students have some protected

interest in public higher education.  *Id.* at 84-86 (assuming that medical student had been

deprived of liberty or property interest when she was dismissed from medical school, and

considering merits of procedural due process claim).  The Fifth Circuit has made the same

assumption in cases decided after *Horowitz*.  *See Shaboon v. Duncan*, 252 F.3d 722, 730 (5th

Cir. 2001) (assuming, without deciding, that medical resident had protected due process

interest in his position); *Davis v. Mann*, 882 F.2d 967, 973 (5th Cir. 1989) (quoting *Horowitz*,

"'assuming the existence of a liberty or property interest,'" and holding that dental resident

received adequate process under Fourteenth Amendment).

"The fundamental requirement of due process is the opportunity to be heard 'at a

meaningful time and in a meaningful manner.'"  *Mathews*, 424 U.S. at 333 (quoting

*Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  But due process, "unlike some legal rules,

- 23 -

is not a technical conception with a fixed content unrelated to time, place and circumstances"; instead, it is "flexible and calls for such procedural protections as the particular situation demands." *Id.* at 334 (citations and internal quotation marks omitted). In a public university setting, the level of procedural protection that students are due varies according to whether they were dismissed for disciplinary or academic reasons. *See Horowitz*, 435 U.S. at 86. On the one hand, when a student is dismissed for disciplinary reasons, the Fourteenth Amendment requires that "the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss v. Lopez*, 419 U.S. 565, 581 (1975). But on the other hand, academic dismissals "call[] for far less stringent procedural requirements," *Horowitz*, 435 U.S. at 86, although the student must "be given some meaningful notice and an opportunity to respond." *Davis*, 882 F.2d at 975 (citing *Mathews*, 424 U.S. at 333).

## C

The court must first decide whether Shah has plausibly alleged that the decision to dismiss him from UT Southwestern was disciplinary rather than academic.

"A student is dismissed for disciplinary reasons when he violates a valid rule of conduct." *Aragona v. Berry*, 2012 WL 467069, at *5 (N.D. Tex. Feb. 14, 2012) (Fish, J.) (citing *Horowitz*, 435 U.S. at 87; *Shaboon*, 252 F.3d at 730). In *Horowitz* the Supreme Court held that a medical student's dismissal was academic when the decision "rested on the academic judgment of school officials that [the student] did not have the necessary clinical

- 24 -

ability to perform adequately as a medical doctor and was making insufficient progress toward that goal." *Horowitz*, 435 U.S. at 89-90; *see also Mathai v. Bd. of Supervisors of La. State Univ. & Agr. & Mech. Coll.*, 959 F.Supp.2d 951, 960 (E.D. La. 2013) (reviewing cases from First, Sixth, and Seventh Circuits, and concluding that "an academic dismissal will be found where a student's scholarship or conduct reflects on the personal qualities necessary to succeed in the field in which he or she is studying and is based on an at least partially subjective appraisal of those qualities." (citations and internal quotation marks omitted)); *Aragona*, 2012 WL 467069, at *6 (holding that dismissal was academic rather than disciplinary where there was no evidence to suggest that dental student was punished for any sort of behavioral misconduct, and, instead, that student's "problems stem largely from his inability to act professionally in his clinical responsibilities.").

Shah contends that his dismissal was disciplinary because the Policy was designed to "correct improper 'behavior,' which is the same as 'misconduct.'" P. Br. 15. Shah cites language in the Policy that it includes a mechanism "to address and remediate problematic *behavior* in the clinical clerkships," *id.* at 14 (quoting Am. Compl. Ex. B at 2); he contends that, as applied to him, the Policy was used to correct improper "behavior" because the PEFs refer only to his alleged *misconduct*, not to his grades or academic performance; and he posits that Dr. Shah and others [Dr. Duval] accused him of plagiarism and cheating, and that there is nothing in UT Southwestern's records that demonstrates that he was dismissed for poor grades, lack of technical knowledge, improper application of that knowledge, lack of patient care, lack of empathy, or poor interpersonal skills.

- 25 -

Although Shah characterizes his dismissal as "disciplinary," alleging throughout his amended complaint that the UT Southwestern faculty used the Policy in a punitive manner, the court's assessment of the amended complaint compels it to conclude, as in *Shah I*, that he is alleging an academic dismissal.  *See Shah I*, 54 F.Supp.3d at 694 ("It is apparent that Shah is complaining of an *academic* decision rather than a *disciplinary* decision.").  Shah alleges that the July 2012 PEF was issued because Dr. Wagner believed that Shah had "waited too long" to request permission to begin his third year of medical school without taking the national exam.  Am. Compl. ¶ 4.56.  Shah does not contend that the July 2012 PEF was issued as a form of punishment for any sort of misconduct.  In fact, Shah alleges that "there is no rule determining a specific date by which a medical student must take certain national exams."  *Id.* ¶ 4.55.  Similarly, Shah avers that the March 2013 PEF was issued as a result of Dr. Vicioso's conclusion that Shah had failed to timely and satisfactorily prepare three patient write-ups.  *See id.* ¶ 4.27 (alleging "Dr. Vicioso suddenly and without warning loudly proclaimed to Shah . . . that she was giving him a failing grade and was going to write up a [PEF] *because Student Shah had not yet submitted the third write-up*." (emphasis added)).  He does not contend that Dr. Vicioso accused him of any sort of behavior.[12]  These allegations permit only the conclusion that the professors who issued the PEFs determined

---

[12]The Policy states that PEFs are to be issued when students "do not demonstrate adequate professional and personal attributes," including "Professional Attributes and Responsibilities, Self Improvement and Adaptability, Relationships with Patients, or Interpersonal Relationships with other members of the Health Care Team."  Am. Compl. Ex. B at 9.

that Shah had failed to demonstrate adequate professional or personal attributes necessary to the practice of medicine, not that he had violated any particular rule of conduct. *See Horowitz*, 435 U.S. at 89-90 (holding that dismissal was academic when it "rested on the academic judgment of school officials that [student] did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal. Such judgment is by its nature more subjective and evaluative than the typical factual questions presented in the average disciplinary decision."); *Shaboon*, 252 F.3d at 725-26, 731 (characterizing medical resident's dismissal as academic—even though it was based on her exhibiting signs of mental illness, refusing to cooperate fully with psychiatrists, and refusing to take her medication—since it implicated her fitness to perform as a doctor); *Wheeler v. Miller*, 168 F.3d 241, 250 (5th Cir. 1999) (concluding that "genuine academic decisions" are not limited "only to those decisions based purely on test scores or some other objective academic criteria" but may, instead, be "based on university concerns about the student's 'lack of judgment and an inability to set priorities.'" (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 227 n.13 (1985))).

Nor is Shah's contention that Dr. Shah accused him of "plagiarism and cheating," P. Br. 15, sufficient to plausibly allege that UT Southwestern's decision to dismiss him was disciplinary. First, in the May 2013 Letter, Dr. Shah concluded that although Shah had quoted several sentences from a medical textbook without appropriately using quotation marks, Shah did, in fact, cite the textbook as a reference, and "[b]y itself, this issue would not result in a failing grade or professionalism form as the bulk of the write up was his

original work." Am. Compl. Ex. C at 11. Second, Shah does not indicate anywhere in his amended complaint that allegations of plagiarism or cheating factored into UT Southwestern's decision to dismiss him.

### D

The Due Process Clause does not require that students dismissed for failure of academic performance be given a hearing. *See Horowitz*, 435 U.S. at 90 ("[W]e decline to ignore the historic judgment of educators and thereby formalize the academic dismissal process by requiring a hearing."); *Davis*, 882 F.2d at 975 (holding that where student was dismissed for failure of academic performance, he "was not entitled to any hearing—much less the full-blown post[-]termination hearing he received."). Nor does due process require that a student dismissed based on poor academic performance be afforded a right of appeal. *See, e.g., Yoder v. Univ. of Louisville*, 526 Fed. Appx. 537, 551 (6th Cir. 2013) (unpublished table decision) (holding that "post-dismissal appeal hearing was not constitutionally required" where nursing student was dismissed for academic reasons). Instead, a student has received all the procedural due process required where "[t]he school fully informed [him] of the faculty's dissatisfaction with [his] clinical progress and the danger that this posed to timely graduation and continued enrollment." *Horowitz*, 435 U.S. at 85.

Taken in the light most favorable to Shah, the allegations of his amended complaint only permit the court to draw the reasonable inference that Shah received more procedural protections than are required by the Fourteenth Amendment Due Process Clause in an academic dismissal context. The Policy clearly states that "Students who receive two or

more [PEFs] in the clinical years will be placed on academic probation and can be referred

to the [SPC] for review of the deficiencies.  The SPC can recommend dismissal."  Am.

Compl. Ex. B at 9.  Thus Shah was on notice that he could be dismissed if he received two

PEFs during his clinical years.  For each PEF that Shah received, he was notified that he was

receiving the PEF and was informed of the reason why.[13]  Shah wrote a letter to the SPC

accepting the charges against him, taking responsibility, and suggesting an improvement

plan; he was permitted to appeal the SPC's decision to dismiss him; and he was permitted

to file a final appeal with the Provost and Dean.[14]

    Taken in the light most favorable to Shah, the facts alleged in the amended complaint

do not permit the court to draw the reasonable inference that Shah was deprived of his right

to procedural due process.  Instead, as the court concluded in *Shah I*, "the allegations show

that Shah was afforded 'some meaningful notice and an opportunity to respond.'"  *Shah I*,

54 F.Supp.3d at 695 (quoting *Davis*, 882 F.2d at 975).  Accordingly, the court grants

defendants' motion to dismiss Shah's procedural due process claim.

---

[13]Although Shah alleges that "nothing in the dismissal proceedings identified specifically which of the standards of professional conduct Student Shah had violated," Am. Compl. ¶ 4.64, he does not allege that he did not know why Drs. Wagner and Vicioso issued the PEFs against him.

[14]Although Shah omits from his amended complaint any allegations regarding the letter he wrote to the SPC and the final appeal he was permitted to pursue, he pleaded these facts in his complaint, and the court relied on these allegations in reaching its decision in *Shah I*, 54 F.Supp.3d at 695.  Nothing in the amended complaint suggests that these previously-pleaded facts were inaccurate.

VI

The court now considers Shah's substantive due process claim.

A

Defendants move to dismiss Shah's claim that the Policy is unconstitutional "as applied," arguing that "strict scrutiny," as pleaded in the amended complaint, applies only in the context of an equal protection claim or free speech claim and that Shah has not pleaded an equal protection or free speech claim.  They also move to dismiss Shah's substantive due process claim, to the extent Shah intends to plead such a claim, contending that, for the reasons identified in *Shah I*, Shah's amended complaint does not include well-pleaded facts that, if believed, would lead to the conclusion that Dr. Vicioso or Dr. Shah violated Shah's substantive due process rights, "as none of the alleged behavior represented such a departure from academic norms that it represented the complete lack of discretion."  Ds. Br. 14.

Shah responds that it is well known that any time a state actor infringes on or threatens to infringe on any fundamental constitutional right, the court must apply a "strict scrutiny" analysis, which requires the court to invalidate any state statute or policy that is not narrowly tailored to serve a compelling governmental interest.  He posits that "[t]here can be no question that [he] has properly pled his fundamental constitutional rights here, and no question that his 'substantive' due process rights have been violated."  P. Br. 10 (citing Am. Compl. ¶¶ 4.1 and 4.2).  Shah then lists 14 "salient facts" that he contends demonstrate that

his liberty and property interests have been harmed and are at risk of being further harmed.[15]

B

Shah appears to challenge the Policy, as applied, under the substantive component of the Due Process Clause of the Fourteenth Amendment.[16]  The Supreme Court recognizes that

_____

[15]The following "salient facts" appear to be relevant to Shah's substantive due process claim:

> These professors' conduct, in their "official capacity," constituted such a substantial departure from accepted academic norms as to demonstrate that they did not actually exercise professional judgment.  The pinpoint specific facts with dates, names, places and quotes, explains how, when, where and why.  See Sections 4.1-4.62, and Appendix "A" of FAC.

> These professors' conduct, in their ["]official capacity," went far beyond the pale of reasoned academic decision-making in light of Shah's entire academic career.  The pinpoint specific facts with dates, names, places and quotes, explains how, when, where are why.  See Sections 4.1-4.62, and Appendix "A" of FAC.

P. Br. 12 (paragraph numbers omitted).  Shah's citing broadly to more than 62 paragraphs of his amended complaint and a 10-page appendix is insufficient to meet his burden in responding to defendants' Rule 12(b)(6) motion.  Nevertheless, the court will proceed to evaluate the allegations in the amended complaint to determine whether Shah has plausibly alleged a substantive due process claim.

[16]Shah alleges that the Policy is unconstitutional because its application was too vague to put him on notice of the allegations supporting his dismissal; its application harms his liberty and property interests in his professional reputation; and, as applied, the Policy did not further a compelling government interest, was not narrowly tailored to further that interest, and did not use the least restrictive means to further that interest.  Shah does not specify in the amended complaint which provision of the Constitution he maintains the Policy violates, but he suggests in his response brief that he maintains that UT Southwestern's application of the Policy violated his substantive due process rights.

- 31 -

the Due Process Clause is more than a guarantee of procedural fairness, and that it "cover[s] a substantive sphere as well, 'barring certain government actions regardless of the fairness of the procedures used to implement them.'" *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). "The reach of substantive due process is limited, however, and it protects against only the most serious of governmental wrongs." *Moore v. Dall. Indep. Sch. Dist.*, 557 F.Supp.2d 755, 761 (N.D. Tex. 2008) (Fitzwater, C.J.) (citation omitted). "[B]ecause guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended," courts should be "reluctant to expand the concept of substantive due process." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992).

The Due Process Clause provides heightened protection against government interference with certain fundamental rights and liberty interests. *Reno v. Flores*, 507 U.S. 292, 301-02 (1993). If a due process challenge implicates a fundamental right, the court applies strict scrutiny. *Id.* Under strict scrutiny, States are prohibited "from infringing fundamental liberty interests, unless the infringement is narrowly tailored to serve a compelling state interest." *Lawrence v. Texas*, 539 U.S. 558, 593 (2003) (emphasis omitted) (citing *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). If a due process challenge does *not* implicate a fundamental right or liberty interest, the law is reviewed under the more deferential rational basis standard. *See, e.g., Glucksberg*, 521 U.S. at 721 (holding that only fundamental rights that are "deeply rooted in this Nation's history and tradition" qualify for anything other than rational basis scrutiny).

Shah appears to contend that his liberty and property interests in his professional reputation constitute "fundamental constitutional rights" that cannot be infringed unless the infringement is narrowly tailored to serve a compelling state interest.  Yet he cites no authority for the proposition that a person's liberty or property interest in his professional reputation constitutes a fundamental right or liberty interest protected by the Due Process Clause, and subject to strict scrutiny review.  Neither the Supreme Court nor the Fifth Circuit has recognized such a right.[17]  Accordingly, to the extent Shah challenges the constitutionality of the Policy as applied to him—including based on his assertion that the application of the Policy was too vague to put him on notice of the allegations supporting his dismissal—the court concludes that strict scrutiny review does not apply.

## C

## 1

To the extent Shah challenges as a violation of substantive due process the issuance of the PEFs by Drs. Wagner, Vicioso, and Shah, or his dismissal from UT Southwestern, the court will review Shah's amended complaint based on the standard articulated in *Shah I* that courts have used when evaluating substantive due process challenges to academic decisions in the university context.  In *Shah I* the court explained:

---

[17]The Supreme Court has recognized that the right to an education, while important, is not a fundamental right.  *See Kadramas v. Dickinson Pub. Schs.*, 487 U.S. 450, 458 (1988) ("Nor have we accepted the proposition that education is a "fundamental right," like equality of the franchise, which should trigger strict scrutiny when government interferes with an individual's access to it." (citing *Papasan*, 478 U.S. at 284)).

In [*Ewing*, 474 U.S. 214], the Supreme Court assumed the existence of a constitutionally protected property right in a student's continued enrollment in a state university and held that "decisions in the academic setting are subject to 'a narrow avenue for judicial review' under a substantive due process standard." The *Ewing* Court explained:

> When judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

*Ewing*, 474 U.S. at 225. Accordingly, "[c]ourts must accept, as consistent with due process, 'an academic decision that is not beyond the pale of reasoned academic decision-making when viewed against the background of [the student's] entire career at the University.'"

*Shah I*, 54 F.Supp.3d at 696 (alterations in original) (some citations omitted).

2

The court begins with Shah's challenge to the July 2012 PEF as an unconstitutional application of the Policy. In his amended complaint, Shah alleges that Dr. Wagner, the same professor who granted him permission to start his third year without taking his national exam, issued the PEF on the ground that Shah had "waited too long" to request permission. Shah avers that, had he been on notice that not requesting more time to take the national exam would result in issuance of a PEF, he would have taken the exam earlier or would have emailed sooner his request for more time. He also argues that, under the Policy, the July 2012 PEF should not have counted as a PEF occurring *during the clinical years* because it was technically issued between semesters. Shah characterizes the July 2012 PEF as

- 34 -

"amount[ing] to hazing medical students," Am. Compl. ¶ 4.57, and the amended complaint alleges that the July 2012 PEF, in conjunction with the resulting dismissal, "goes far beyond the pale of reasoned academic decision-making in light of the student's entire academic career and is such a substantial departure from accepted academic norms as to demonstrate that [UT Southwestern] did not actually exercise professional judgment." *Id.* at 4.60. Shah also seeks a declaration that the Policy is void for vagueness as applied to him, and that, because the Policy was applied in an unconstitutional manner, the July 2012 PEF and resulting dismissal are invalid.

Taken in the light most favorable to Shah, the amended complaint does not allege facts that show that the issuance of the July 2012 PEF deprived Shah of his right to substantive due process. Assuming *arguendo* that Shah has a substantive due process right at all, the court concludes that the allegations of the amended complaint are inadequate to enable the court to draw the reasonable inference that Dr. Wagner's actions in connection with the July 2012 PEF were "such a substantial departure from accepted academic norms as to demonstrate that [he] did not actually exercise professional judgment." *Ewing*, 474 U.S. at 225. Shah alleges that Dr. Wagner issued the PEF on the basis that Shah had "waited too long" to request permission to begin his third year without first taking the national exam, despite the fact that there was no specific deadline to make such a request. But the allegations of the amended complaint do not enable the court to draw the reasonable inference that Dr. Wagner did not actually exercise professional judgment in determining that Shah had waited too long. Nor does the absence of a specific deadline, or the failure of the

- 35 -

Policy to notify students that waiting too long to take the exam or request more time can or will result in a PEF, enable the court to draw the reasonable inference that Dr. Wagner did not actually exercise professional judgment when issuing the July 2012 PEF.

Regarding UT Southwestern's classification of the July 2012 PEF as occurring during Shah's clinical years, Shah has not alleged any facts that enable the court to draw the reasonable inference that this decision was made without exercising professional judgment. Although issued in July 2012, the July 2012 PEF related to Shah's failure to timely request permission to delay taking his national exams until his third year. And because the July 2012 PEF was issued after Shah had completed his second year, the court cannot draw the reasonable inference that the decision to treat Shah's actions as occurring during his clinical years was made without exercising professional judgment.

3

The court next considers the March 2013 PEF. Taken in the light most favorable to Shah, the amended complaint and accompanying appendix (Appendix "A") do not allege facts that enable the court to draw the reasonable inference that Dr. Vicioso's conduct in connection with issuing the March 2013 PEF deprived Shah of substantive due process. Assuming *arguendo* that Shah has a substantive due process right at all, the court concludes that the allegations of the amended complaint are insufficient to enable the court to draw the reasonable inference that Dr. Vicioso's actions were "such a substantial departure from accepted academic norms as to demonstrate that [she] did not actually exercise professional judgment." *Id.*

- 36 -

Shah alleges in his amended complaint that Dr. Vicioso refused to read his first patient write-up because he requested a few more hours to research his patient's complex neuro symptoms; refused to read his second patient write-up because it was "sloppy" and contained typos and skewed formatting of the first page; and announced that she was giving Shah a failing grade and issuing him a PEF because he had not yet submitted his third write-up on the morning of the last day of the clinical rotation, even though the write-up was not yet due because the rotation was not yet complete.  Shah avers that Dr. Vicioso's pattern of abusive and bullying conduct is beyond the pale of reasoned academic decisionmaking in light of Shah's entire academic career, and that her conduct was such a substantial departure from accepted academic norms as to demonstrate that she did not actually exercise professional judgment.

To determine whether Shah has plausibly alleged a substantive due process claim based on the March 2013 PEF, the court considers whether the allegations are sufficient to enable the court to draw the reasonable inference that the challenged conduct was "such a substantial departure from accepted academic norms as to demonstrate that [she] did not actually exercise professional judgment." *Id.*  In doing so, the court "must accept, as consistent with due process, 'an academic decision that is not beyond the pale of reasoned academic decision-making when viewed against the background of [the student's] entire career at the University.'" *Wheeler*, 168 F.3d at 250 (alteration in original) (quoting *Ewing*, 474 U.S. at 227-28).  Although Shah disagrees with Dr. Vicioso's stated reasons for not reading his first two patient write-ups and for determining that he had missed the deadline

for his third patient write-up, the amended complaint clearly alleges that Dr. Vicioso gave Shah specific reasons each time she refused to read one of his patient write-ups, and there is nothing in the amended complaint that would enable the court to draw the reasonable inference that Dr. Vicioso did not actually exercise professional judgment when she issued Shah the March 2012 PEF.

Moreover, the allegations in Appendix "A," which Shah requests be incorporated into the amended complaint, and which the court accepts as true, demonstrate that Dr. Vicioso exercised professional judgment when issuing the March 2013 PEF, and that, despite Shah's disagreement with Dr. Vicioso's version of the events and assessment of his performance in the clinical rotation, her decision to issue the PEF was neither unsupported nor "beyond the pale of reasoned academic decision-making when viewed against the background of [Shah's] entire career at the University." *Wheeler*, 168 F.3d at 250. Shah includes in Appendix "A" statements by Drs. Vicioso, Bergen, and Shah, and Tara Duval, M.D. ("Dr. Duval")[18] that demonstrate that each of these professors had found deficiencies in Shah's performance and attitude. He alleges that Dr. Vicioso determined that Shah had "[f]ailed to produce second write-up when requested," Am. Compl. Ex. A ¶ 4.6.1; that Shah's "[f]irst write up [was] sloppy with copied and pasted ROS that contradicted HPI," *id.* ¶ 4.6.2; that Shah "[d]id not take feedback well first time when [she] asked him to re-write write-up: 'unfair' When asked about above, did not apologize, but gave [her] excuses," *id.* ¶ 4.6.4; that Shah "[t]ells [her]

_____

[18]Although Shah named Dr. Duval as a defendant in her individual capacity in his complaint, he does not include her as a defendant in his amended complaint.

he makes decisions on his own, does not think the rules are set in stone," *id.* ¶ 4.6.5; that

Shah "[d]ivides patients and their problems into interest worthy and not interest worthy," *id.*

¶ 4.6.8; that "[o]n rounds [Shah] would present f[r]ee hand and carelessly," *id.* ¶ 4.6.10; that

Shah "did not take [her] mid session feedback to him seriously even when [she] asked him

to talk it back to [her]," *id.* ¶ 4.6.11; that Shah "also decided not to write two progress notes

on another patient because he had 'nothing new to say' even though we had spent 20 minutes

on rounds figuring out reasons for his recurrent nausea," *id.* ¶ 4.6.12; that "[h]e thought [the

mid session feedback] was unfair and his performance four days thereafter did not

incorporate any of [her] suggestions other [than] that he wear a tie," *id.* ¶ 4.6.13; and that

"[h]e has excuses for everything" and "could not tell [her] what he would do differently," *id.*

¶ 4.6.20-21.

Shah contends that Dr. Duval wrote that he "showed up late multiple times to rounds

even after being explicitly told about what time to arrive and what was required," *id.* ¶

4.6.22; that Shah had "[p]lagiari[sed] on his H&P . . . with verbatim text from Harrisons

without that text being placed in quotes," *id.* ¶ 4.6.23; that Shah's "presentations lacked

organization, and at our one week feedback session he brought this up himself and

demonstrated insight into the problem," *id.* ¶ 4.6.24; that "[d]espite discussing coming in on

time to see all of his patients, [Shah] continued to show up late on occasion," *id.* ¶ 4.6.25;

and that "[m]embers of the team got the impression that he was disinterested," *id.* ¶ 4.6.26.

Shah alleges that Dr. Bergen wrote that "[i]n response to this feedback, I observed

during the second half of the rotation that he avoided speaking with me directly except when

he was required to present patients," *id.* ¶ 4.6.17; that "[Shah's] clinical care was adequate but affected by shyness and insecurity in interpersonal relationships," *id.* ¶ 4.6.18; and that Shah "[w]as occasionally unavailable in the OR," *id.* ¶ 4.6.19.

Shah avers that Dr. Shah stated that "[i]n meeting with me, [Shah] did not cite mitigating or explanatory reasons why his performance was so different during the second month," *id.* ¶ 4.6.15; that "[b]oth [Dr. Duval and Dr. Vicioso] wrote that about two to three times a week, [Shah] was late in arriving—and often had not seen his patient yet and so the interns would present the updates at work-rounds," *id.* ¶ 4.6.27; and that the failure to properly quote authorities "is indicative of taking shortcuts in work," *id.* ¶ 4.6.30.

Although Shah disputes most of the statements attributed to these professors, he does not allege that Drs. Vicioso, Duval, Bergen, and Shah did not genuinely believe the accuracy of their assessments of Shah's performance or base their conclusions about Shah's deficient performance and professionalism on the exercise of professional judgment.

As *Shah I* explains, Shah's allegations that other professors also provided negative reviews of his professionalism supports the conclusion that Dr. Vicioso's evaluation of Shah's performance and professionalism was not beyond the pale of reasoned academic decisionmaking when viewed against the background of Shah's entire career at the University.  *Shah I*, 54 F.Supp.3d at 699 (quoting *Wheeler*, 168 F.3d at 250).

Finally, Shah's allegations that Dr. Vicioso violated the Policy by failing to help rehabilitate, remediate, and improve his performance—as the Policy requires—are insufficient to enable the court to draw the reasonable inference that she failed to exercise

professional judgment or that her decision to issue the March 2013 PEF was beyond the pale of reasoned academic decisionmaking when viewed against the background of Shah's entire career at UT Southwestern.  *Ewing*, 474 U.S. at 225; *Wheeler*, 168 F.3d at 250.

4

Shah also appears to challenge Dr. Shah's actions in filing the March 2013 PEF and in writing the May 2013 Letter to the SPC.  He alleges that because Dr. Shah made the decision to file the PEF on Monday, March 11, 2013 (just three days after Dr. Vicioso announced that she was issuing Shah a PEF and a failing grade for the rotation), and because Dr. Vicioso was Dr. Shah's senior, Dr. Shah was "compelled to 'rubber-stamp' her recommendation."  Am. Compl. ¶ 4.36.  Shah also avers that Dr. Shah did not ask any questions to determine the merits of Dr. Vicioso's concerns; never asked Shah to explain his side of the story; and failed to give Shah feedback, to make recommendations for improvement, or to schedule a meeting with Shah and the Associate Dean of Student Affairs, as the Policy required.  In sum, Shah alleges that

> Dr. Shah's "rubber stamping" of Dr. Vicioso's decision, his failure to conduct a full investigation on the merits before issuing the PEF, his failure to "provide feedback and make recommendations for improvement," his *post hoc* justifications in his letter written two months later, and his acknowledgement that he knew this particular PEF would result in dismissal go far beyond the pale of reasoned academic decision-making in light of the student[']s entire academic career. . . .  Moreover, these facts demonstrate that Dr. Shah's conduct was such a substantial departure from accepted academic norms as to demonstrate that [he] did not actually exercise professional judgment."

*Id.* ¶ 4.45-.46 (second alteration in original).

The amended complaint asserts that Dr. Shah must have "rubber-stamped" the decision of Dr. Vicioso and must have failed to conduct a full investigation on the merits before issuing the PEF because he informed Shah on Monday, only three days after Dr. Vicioso announced that she was issuing the PEF, that he was going to file the PEF, and because Dr. Shah sent his May 2013 Letter to the SPC containing his "thorough investigation" almost two months later.  But merely because Dr. Shah made his decision in three days (over a weekend) is insufficient, without more, to plausibly allege that Dr. Shah failed to investigate Dr. Vicioso's allegations against Shah and to reach an independent conclusion regarding the PEF.  Nor do Shah's allegations that Dr. Shah failed to provide feedback as the Policy requires enable the court to draw the reasonable inference that, in filing the PEF and writing the May 2013 Letter to the SPC, Dr. Shah failed to exercise professional judgment or made a decision that is beyond the pale of reasoned academic decisionmaking when viewed against the background of Shah's entire career at UT Southwestern.  *Ewing*, 474 U.S. at 225; *Wheeler*, 168 F.3d at 250.

## 5

Although Shah challenges various procedural aspects of his dismissal, he does not allege that the dismissal was unconstitutional on any basis other than that the two PEFs on which the dismissal was based violated his substantive due process rights.  Shah has failed to plausibly allege that the July 2012 PEF or March 2013 PEF was issued as a result of the failure to exercise professional judgment, or that the issuance of the two PEFs was beyond the pale of reasoned academic decisionmaking when viewed against the background of

Shah's entire career at UT Southwestern. *Ewing*, 474 U.S. at 225; *Wheeler*, 168 F.3d at 250. Accordingly, to the extent Shah intends to plead a substantive due process claim based on the decisions to issue the two PEFs or the decision to dismiss him from UT Southwestern, the court grants defendants' motion to dismiss.

* * *

For the foregoing reasons, the court denies defendants' Rule 12(b)(1) motion to dismiss the amended complaint and grants defendants' motion to dismiss the amended complaint under Rule 12(b)(6). The court dismisses this action with prejudice as to defendants UT Southwestern and Dean Fitz by Rule 54(b) final judgment filed today.

**SO ORDERED**.

September 11, 2015.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE